# EXHIBIT A

Richard Best
Kristina Littman
Preethi Krishnamurthy
Jorge G. Tenreiro
Dugan Bliss
John O. Enright
Daphna A. Waxman
Jon A. Daniels
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | 20 Civ. 10832 |
| : | |
| - against - : | ECF Case |
| : | |
| RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, : | <u>Complaint</u> |
| and CHRISTIAN A. LARSEN, : | Jury Trial Demanded |
| : | |
| Defendants. : | |
| : | |

------------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "SEC"), for its Complaint against

Defendants Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse ("Garlinghouse"), and Christian A.

Larsen ("Larsen" and, with Ripple and Garlinghouse, "Defendants"), alleges as follows:

<u>SUMMARY</u>

1.      From at least 2013 through the present, Defendants sold over 14.6 billion units of a

digital asset security called "XRP," in return for cash or other consideration worth over $1.38 billion

U.S. Dollars ("USD"), to fund Ripple's operations and enrich Larsen and Garlinghouse. Defendants

undertook this distribution without registering their offers and sales of XRP with the SEC as

required by the federal securities laws, and no exemption from this requirement applied.

2.  Because Ripple never filed a registration statement, it never provided investors with the material information that every year hundreds of other issuers include in such statements when soliciting public investment. Instead, Ripple created an information vacuum such that Ripple and the two insiders with the most control over it—Larsen and Garlinghouse—could sell XRP into a market that possessed only the information Defendants chose to share about Ripple and XRP.

3.  Ripple engaged in this illegal securities offering from 2013 to the present, even though Ripple received legal advice as early as 2012 that under certain circumstances XRP could be considered an "investment contract" and therefore a security under the federal securities laws.

4.  Ripple and Larsen ignored this advice and instead elected to assume the risk of initiating a large-scale distribution of XRP without registration.

5.  From a financial perspective, the strategy worked. Over a years-long unregistered offering of securities (the "Offering"), Ripple was able to raise at least $1.38 billion by selling XRP without providing the type of financial and managerial information typically provided in registration statements and subsequent periodic and current filings. Ripple used this money to fund its operations without disclosing how it was doing so, or the full extent of its payments to others to assist in its efforts to develop a "use" for XRP and maintain XRP secondary trading markets.

6.  Meanwhile, Larsen—Ripple's initial chief executive officer ("CEO") and current chairman of the Board—and Garlinghouse—Ripple's current CEO—orchestrated these unlawful sales and personally profited by approximately $600 million from their unregistered sales of XRP.

7.  Garlinghouse did so while repeatedly touting that he was "very long" XRP, meaning he held a significant position he expected to rise in value, without disclosing his sales of XRP.

8.  Defendants continue to hold substantial amounts of XRP and—with no registration statement in effect—can continue to monetize their XRP while using the information asymmetry they created in the market for their own gain, creating substantial risk to investors.

## VIOLATIONS

9.      By engaging in the conduct set forth in this Complaint, Defendants engaged in and are currently engaging in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], and Larsen and Garlinghouse also aided and abetted Ripple's violations of those provisions.

10.     Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating Sections 5(a) and 5(c) of the Securities Act, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)]; (b) pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act"), (i) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon and (ii) prohibiting Defendants from participating in any offering of digital asset securities; and (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

14.     Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Among other acts, Ripple has an office in this District. Garlinghouse made certain statements at issue in this case while physically present in this District. All Defendants sold or orchestrated sales of XRP to purchasers residing in this District and enlisted entities domiciled in this District to sell the securities at issue in this case.

## DEFENDANTS

16.     **Ripple**, f/k/a Open Coin, Inc., is a Delaware corporation founded in September 2012, with its principal place of business in San Francisco, California, and an office in Manhattan.

17.     **Garlinghouse**, age 49, is a California resident who was Ripple's chief operating officer ("COO") from April 2015 through December 2016, and who has served as its CEO from January 2017 to the present.

18.     **Larsen**, age 60, is a California resident who co-founded Ripple and served as its CEO from September 2012 through December 2016, and who today serves as executive chairman of Ripple's Board of Directors.  Larsen received nine billion XRP shortly after Ripple's founding.  In 2005 Larsen co-founded, and through 2011 served as the CEO of, a company sued by the SEC in November 2008 for violating Sections 5(a) and (c) of the Securities Act.

## RELATED ENTITY AND INDIVIDUALS

19.     **XRP II, LLC,** f/k/a XRP Fund, LLC ("XRP II"), is Ripple's wholly-owned subsidiary.  It was founded in approximately 2013, has been organized as a New York limited liability company since at least 2015, and is the entity through which Ripple offered and sold most of its XRP in the Offering.  XRP II is registered as a money service business with the United States Financial Crimes Enforcement Network ("FinCEN") and as a virtual currency business with the New York State Department of Financial Services ("NYDFS").

4

20.    **Co-Founder**, age 45, is a California resident who co-founded Ripple and received nine billion XRP shortly after Ripple's founding.

21.    **Cryptographer-1**, age 51, is a California resident who served as Ripple's chief cryptographer until July 2018 and is currently Ripple's chief technology officer.

22.    **Ripple Agent-1**, age 55, is a California resident who co-founded Ripple and received two billion XRP shortly after Ripple's founding.

23.    **Ripple Agent-2**, age 42, is a Florida resident who served as Ripple's "Head of XRP Markets" from November 2016 through April 2020.

24.    **Ripple Agent-3,** age 36, is a California resident who served as Ripple's executive vice president of business development from February 2013 to January 2015, and its senior vice president of business development from February 2015 through May 2018.

## STATUTORY AND LEGAL FRAMEWORK

25.    Congress enacted the Securities Act to regulate the offer and sale of securities.  In contrast to ordinary commercial principles of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring a company (an issuer) and its control persons who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

26.    Sections 5(a) and 5(c) of the Securities Act require that an issuer of securities like Ripple, and its control persons and affiliates like Larsen and Garlinghouse, register offers and sales of those securities with the SEC when they offer and sell securities to the public, absent certain exemptions that do not apply to Defendants' transactions.  Registration statements relating to an offering of securities thus provide public investors with material information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

27.     Section 5 of the Securities Act is all embracing; it prohibits any unregistered securities offering.  Through exemption provisions like Section 4 of the Securities Act [15 U.S.C. § 77d], however, Congress distinguished between (1) sales by issuers of their securities into public markets, which require registration, and (2) ordinary trading transactions in the market by investors, once the securities have come to rest with them, which typically are exempted from registration.

28.     Congress sought to provide the protections afforded by registration both where securities are sold directly to the public by the issuer, and where they are publicly sold through an intermediary who buys the stock from the issuer with a view to public resale, *i.e.*, "underwriters."  15 U.S.C. § 77b(a)(11).  Congress enacted a broad definition of underwriter to include all persons who might operate as conduits for securities being placed into the hands of the investing public.

29.     An issuer's sales of securities may be exempt from registration provided they are not part of a public offering.  Securities distributions, or public offerings, by issuers, with or without the use of underwriters, are not exempt from registration and must be registered under Section 5.  Exemptions and safe harbors from registration are structured to exempt transactions where the purpose and protections of registration have been otherwise satisfied.  The party claiming an exemption bears the burden of showing the transaction is entitled to one.

30.     After an issuer registers the offer and sale of its securities under the Securities Act, the Exchange Act requires it to make periodic and current public disclosures, including annual, quarterly, and current reports that provide similar disclosure, including a description of the issuer's business, management's discussion and analysis, disclosure of significant events, and financial information.  These filings are necessary to achieve the statutory goal of enabling investors in the offering, as well as would-be purchasers in secondary transactions, to make informed decisions.

31.     The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts."  Investment contracts are instruments

through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the Internet.  As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. 293, 299 (1946).

## BACKGROUND ON DIGITAL ASSETS AND DISTRIBUTED LEDGERS

32.     The term "digital asset" or "digital token" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "virtual currencies," digital "coins," and digital "tokens."

33.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.

34.     Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger.

35.     Digital tokens may be traded on digital asset trading platforms in exchange for other digital assets or fiat currency (legal tender issued by a country), at times by being allocated to investors' accounts in the records of the platform (*i.e.*, "off-chain"), without necessarily being transferred from one blockchain address to another (*i.e.*, "on-chain").

36.     Some digital assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain, though other digital assets may also be represented on that same blockchain.  Native tokens typically serve a number of technical functions on a distributed

ledger, such as helping secure the ledger from manipulation or other forms of attacks. Like other "digital tokens," native tokens may also be sold and traded for consideration.

37.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of digital assets at issue in that report were investment contracts and, therefore, securities.

**FACTS**

## I.     The Creation of XRP

### A.     Larsen and Co-Founder Established Ripple

38.     In approximately late 2011 or early 2012, Co-Founder began working on the idea and code for what would become the "XRP Ledger" (a/k/a "Ripple Protocol"). Around that time, he recruited Cryptographer-1 and Ripple Agent-1 to assist him in programming the XRP Ledger.

39.     The XRP Ledger—software code—operates as a peer-to-peer database, spread across a network of computers, that records data respecting transactions, among other things.

40.     During the process to achieve consensus with respect to a new proposed state of the XRP Ledger, each server on the network evaluates proposed transactions from a subset of servers it trusts not to defraud it, also known as the server's "UNL" or "Unique Node List." While each server defines its own trusted servers, the XRP Ledger requires a high degree of overlap between the trusted nodes chosen by each server. Ripple thus publishes its own proposed UNL.

41.     Approximately 40% of the nodes validating transactions on the XRP Ledger are operated by organizations or entities based in the United States, including Ripple itself.

42.     In 2012, Co-Founder hired Larsen to be the CEO of a newly formed company that would continue the XRP Ledger and XRP projects.

8

43.     As CEO, Larsen ran Ripple's day-to-day operations and was responsible for all aspects of company products and strategy and for the growth of and investment in the company. Larsen solicited and participated in meetings with current and prospective Ripple equity and XRP investors and regularly updated Ripple's Board of Directors and shareholders.

44.     In September 2012, Co-Founder, Larsen, and Ripple Agent-1 founded Ripple.

45.     Upon the completion of the XRP Ledger in December 2012, and as its code was being deployed to the servers that would run it, Co-Founder, Ripple Agent-1, and Cryptographer-1 created—at little cost—the final version of what today is a fixed supply of 100 billion XRP.

46.     Co-Founder, Larsen, and Ripple Agent-1 then transferred 80 billion XRP to Ripple and the remaining 20 billion XRP to themselves—9 billion XRP each to Co-Founder and Larsen and 2 billion XRP to Ripple Agent-1—as compensation for Ripple's founders.  After this transfer, Ripple and its founders controlled 100% of XRP.

47.     As Cryptographer-1—a well-respected and known Ripple spokesperson—stated in a recent tweet (on Twitter):  "The people who created XRP are pretty much the same as the people who created Ripple and they created Ripple originally to, among other things, distribute XRP."

48.     XRP, also software code, is a digital asset and the native token on the XRP Ledger.

49.     Ripple and Larsen originally called XRP "Ripple Credits" and, for several years thereafter, participants in the digital asset space simply referred to the digital asset as "Ripples."

50.     Ripple could do little with its billions of XRP at that time, however, and Ripple had limited funds to pursue any operations it may have sought to undertake.  Ripple determined to create a market for and sell XRP to the public to monetize its holdings and finance its operations.

**B.     Ripple's Lawyers Warned Ripple and Larsen that XRP Could Be a Security**

51.     Ripple sought the advice of an international law firm regarding certain state and federal legal risks associated with the distribution and monetization of XRP.

52.     The law firm provided two memos—one on February 8, 2012 and another on October 19, 2012 (the "Legal Memos")—that analyzed these risks.  The first memo was addressed to the Co-Founder and another individual, and the second to Larsen, the Co-Founder, and Ripple.

53.     The Legal Memos warned that there was some risk that XRP would be considered an "investment contract" (and thus a security) under the federal securities laws depending on various factors.  These included, among other things, how Ripple promoted and marketed XRP to potential purchasers, the motivation of such purchasers, and Ripple's other activities with respect to XRP.  If individuals purchased XRP "to engage in speculative investment trading" or if Ripple employees promoted XRP as potentially increasing in price, the Legal Memos warned that Ripple would face an increased risk that XRP units would be considered investment contracts (and thus securities).

54.     Both memos warned that XRP was unlikely to be considered "currency" under the Exchange Act because, unlike "traditional currencies," XRP was not backed by a central government and was not legal tender.

55.     The October 2012 Legal Memo also advised Ripple and Larsen to contact the SEC to obtain clarity as to whether XRP was a security under the federal securities laws.

56.     By at least 2013, Larsen was aware of the contents of the Legal Memos.

57.     On May 26, 2014, Larsen explained in an email to an individual formerly associated with Ripple that the international law firm that wrote the Legal Memos advised "that investors and employees could not receive XRP" because that "could risk SEC designation [as] a security."  Larsen also explained that the XRP he received upon Ripple's founding was "comp[ensation] for . . . personally assuming th[e] risk" of being deemed the issuers of securities—namely, XRP.

58.     In other words, as Larsen himself explained, he was paid at the outset in an asset (potentially worth hundreds of millions of dollars) to assume a risk he knew existed—that the sale of the asset could constitute an offering of securities for which he would be held responsible.

59.     Despite this knowledge and Larsen's familiarity with Section 5 from the SEC enforcement action that his previous company had settled in 2008 while Larsen was its CEO, Ripple and Larsen failed to heed some of the legal advice and warnings in the Legal Memos.  Neither contacted the SEC to obtain clarity about the legal status of XRP before engaging in a large-scale distribution.  Moreover, as described in more detail below, Ripple and Larsen (and later Garlinghouse) offered, sold and promoted XRP as an investment—precisely the type of conduct the Legal Memos had warned could lead to a determination that XRP was a security.

60.     In addition, Ripple and Larsen (and later Garlinghouse) never filed a registration statement with the SEC prior to offering or selling XRP.  Nor did they limit their sales of XRP to transactions that fit within legal exemptions to the registration requirements of the Securities Act. In other words, Ripple and Larsen embarked on a large-scale unregistered public distribution of XRP and—with the goal of immense profits—simply assumed the risk that they were violating the federal securities laws.

**C.     Ripple Began to Distribute XRP**

61.     From 2013 through 2014, Ripple and Larsen made efforts to create a market for XRP by having Ripple distribute approximately 12.5 billion XRP through "bounty programs" that paid programmers compensation for reporting problems in the XRP Ledger's code.  As part of these calculated steps, Ripple distributed small amounts of XRP (typically between 100 and 1,000 XRP per transaction) to anonymous developers and others to establish a trading market for XRP.

62.     At the same time, Ripple began to make public statements with respect to XRP (then Ripple Credits) that began to create in investors an expectation of profit based on Ripple's efforts.

63.     For example, in a promotional document Ripple circulated to potential investors around May 2013, Ripple explained that its "business model is based on the success of its native

currency," that it would "keep between 25% to 30%" of XRP, and noted the "record highs" of prices other digital assets had achieved as something Ripple hoped to emulate for XRP.

64. On May 12, 2013, Cryptographer-1 posted on *Bitcoin Forum*, a popular digital asset forum: "As a corporation, we are legally obligated to maximize shareholder value. With our current business model, that means acting to increase the value and liquidity of XRP. We believe this will happen if the Ripple network is widely adopted as a payment system. . . . One would expect increased demand to increase price."

## II. Ripple Made Unregistered Offers and Sales in Connection with XRP Distributions

### A. Ripple's Plan to Distribute XRP

65. By at least late 2013, Ripple and Larsen viewed the "Goal of Distribution" for XRP as achieving "Network Growth" and "Rais[ing] funds for Ripple Labs operations," as reflected in at least one internal Ripple document titled the "XRP Distribution Framework."

66. Ripple began its efforts by attempting to increase speculative demand and trading volume for XRP though, at first, it did not articulate a single specific strategy about which type of entities or persons it would target to encourage adoption of XRP for any particular non-investment use. As Cryptographer-1 put it in 2013, Ripple was working on "multiple avenues" at the time.

67. Starting in at least 2015, however, Ripple decided that it would seek to make XRP a "universal [digital] asset" for banks and other financial institutions to effect money transfers.

68. According to Ripple's plans, to create acceptance for the universal digital asset, Ripple first had to create an active, liquid XRP secondary trading market. It therefore continued its efforts to develop a use for XRP while increasing sales of XRP into the market. Under the plan, a future "user" of XRP as a universal asset (*i.e.*, a bank) would use the speculative trading market to effect money transfers.

69.     In other words, Ripple's stated business plan made Ripple's conduct alleged here a foregone conclusion—Ripple made it part of its "strategy" to sell XRP to as many speculative investors as possible.  While Ripple touted the potential future use of XRP by certain specialized institutions, a potential use it would deploy investor funds to try to create, Ripple sold XRP widely into the market, specifically to individuals who had no "use" for XRP as Ripple has described such potential "uses" and for the most part when no such uses even existed.

70.     Ripple also lacked the funds to pay for these endeavors and for its general corporate business expenses, which for 2013 and 2014 already exceeded $25 million, without selling XRP.

71.     Ripple's objectives and its own financial reality thus compelled it to actively seek to offer and sell XRP as widely as possible, while controlling supply and demand in the resale market to manage and control liquidity for an imagined, future "use" case.

72.     In August 2013, Ripple started making unregistered offers and sales of XRP in exchange for fiat currencies or digital assets such as bitcoin.

73.     Larsen orchestrated the initial stage of Ripple's Offering of XRP by approving the timing and amount of offers and sales to: (1) purchasers in the open market ("Market Sales"); (2) investment funds, wealthy individuals, or other sophisticated investors ("Institutional Sales"); and (3) others enlisted to assist Ripple's efforts to develop an XRP market (the "Other XRP Distributions").

74.     Garlinghouse joined Ripple as COO in April 2015 and substantially assisted its ongoing unregistered Offering by, among other things, being responsible for its operations.  In January 2017, Garlinghouse became CEO and Larsen retained his role as chairman of the Board.

75.     After the change in corporate structure, both Garlinghouse and Larsen remained key decision makers and participants in Ripple's ongoing Offering.  As CEO, Garlinghouse approved the timing and amounts of unregistered offers and sales of XRP, and, as chairman of the Board, Larsen was consulted on such offers and sales.  Both continue to communicate with potential and

actual XRP investors and Ripple equity shareholders and to participate in certain projects Ripple is pursuing with respect to XRP. Both have continued selling XRP into public markets.

76. In 2017, Defendants also began accelerating Ripple's sales of XRP because, while Ripple's expenses continued to increase (reaching nearly $275 million for 2018), its revenue outside of XRP sales did not.

77. For example, starting in 2016, Ripple began selling two software suites, xCurrent and xVia, from which it has earned approximately $23 million through 2019, though neither uses XRP or blockchain technology. Ripple raised about $97 million in sales of equity securities through 2018 and an additional $200 million in 2019. In other words, the overwhelming majority of Ripple's revenue came from its sales of XRP, and Ripple relied on those sales to fund its operations.

**B. Overview of Ripple's XRP Distribution**

78. Ripple's planned distribution of XRP succeeded.

79. From 2014 through the end of 2019, to fund its operations, Ripple sold at least 3.9 billion XRP through Market Sales for approximately $763 million USD.

80. From 2013 through the end of the third quarter of 2020, Ripple sold at least 4.9 billion XRP through Institutional Sales for approximately $624 million USD, also to fund Ripple's operations, for a total of at least $1.38 billion USD in Market and Institutional Sales alone.

81. The market price for XRP—and Ripple's sales prices in the Offering—ranged from a low price of approximately $0.002 per XRP in 2014 to a high price of $3.84 per XRP in early 2018, an increase of nearly 137,000%. XRP traded at approximately $0.58 USD per XRP as of last week.

82. Ripple also undertook to achieve its goal of widespread distribution of XRP by exchanging XRP for non-cash consideration, such as labor and market-making services. Through the Other XRP Distributions, Ripple paid third parties to assist in its efforts to accomplish as widespread a distribution of XRP as possible and to attempt to develop a "use" for XRP.

83.     Since 2014, Defendants have disbursed at least 4.05 billion XRP (valued at at least $500 million USD when the XRP was distributed) through Other XRP Distributions.

84.     In addition, Larsen (beginning in 2015) and Garlinghouse (beginning in 2017) directly participated in the Offering by offering and selling their own holdings of XRP into the same market as Ripple's Market Sales, typically following the same manner of sale.

85.     From 2015 through at least March 2020, while Larsen was an affiliate of Ripple as its CEO and later chairman of the Board, Larsen and his wife sold over 1.7 billion XRP to public investors in the market.  Larsen and his wife netted at least $450 million USD from those sales.

86.     From April 2017 through December 2019, while an affiliate of Ripple as CEO, Garlinghouse sold over 321 million XRP he had received from Ripple to public investors in the market, generating approximately $150 million USD from those sales.

87.     Defendants offered and sold XRP to any person, without restricting offers or sales to persons who had a "use" for XRP (particularly given that little to no "use" existed until Ripple subsidized some "use" operations in recent months, as described below) and without restricting anyone's ability to resell their XRP to investors within the United States or elsewhere.

88.     With respect to all four types of distribution (Market Sales, Institutional Sales, Other XRP Distributions, and Individual Defendants' XRP Sales), Defendants understood that XRP purchasers routinely resold XRP to other investors in the United States and other countries.  These resales aligned with Defendants' own goals of achieving as widespread a distribution of XRP as possible, which was necessary to promote an aftermarket of buyers and sellers of XRP.

89.     Defendants sold approximately 14.6 billion XRP, as summarized in Table 1, below.

| Type of Sales | Approximate Amount of XRP Sold & Distributed |
|---|---|
| Market Sales | 3.9 billion |
| Institutional Sales | 4.9 billion |
| Other XRP Distributions | 4.1 billion |
| Individual Defendants' XRP Sales – Larsen | 1.7 billion |
| Individual Defendants' XRP Sales – Garlinghouse | 321 million* |
| Total Offering | 14.6 billion |

\* Counted in "Other XRP Distributions" Only

**Table 1: Total Defendants' XRP Sales & Distributions in the Offering**

**C.      Defendants' Market Sales of XRP**

90.      As CEO, Larsen initiated and approved Ripple's Market Sales of XRP.

91.      Ripple conducted the Market Sales first by transferring ownership of XRP on the XRP Ledger directly to investors and later by using traders who specialized in algorithmic digital asset trading to offer and sell XRP to investors, both on the XRP Ledger and on digital asset trading platforms, both in exchange for fiat currencies or other digital assets such as bitcoin.

92.      The entities Defendants enlisted to help carry out the Market Sales—the specialized traders or the trading platforms—were typically not registered with the SEC in any capacity.

93.      Ripple conducted the Market Sales by paying at least four entities commissions, paid in XRP, for executing Ripple's XRP sales to the public on digital asset trading platforms.

94.      One of these entities is based in New York and was registered with the SEC as a broker-dealer until December 2019.  One of the other entities is also based in the United States, while another entity is internationally-based but has offices in the United States.  The fourth entity, through which Ripple conducted most of the Market Sales, is a global digital asset trading firm with an office in the United States (the "Market Maker").

95.     To increase Market Sales throughout the Offering, Ripple has also directed all readers of its website to information about "How to Buy XRP" and has provided a list of digital asset trading platforms, including some with principal places of business in the United States, on which investors can make those purchases.

96.     While each was CEO, Larsen and Garlinghouse had final decision-making authority over which trading venues to use for Market Sales and how much XRP to sell on a particular venue, which Ripple communicated to traders as an overall percentage of XRP's daily trading volume.

97.     At Ripple's direction, the intermediaries such as the Market Maker ensured that Market Sales were programmatically set not to exceed a certain percentage of XRP's overall daily trading volume, and Ripple referred to the Market Sales as "programmatic sales."

98.     On occasion, Ripple employees or the Market Marker consulted Larsen and Garlinghouse as to parameters for conducting Ripple's Market Sales, which they at times approved.

**D.      Defendants' Public Distribution through Institutional Sales of XRP**

99.     Since at least 2013, Ripple and Larsen tried to make Institutional Sales to obtain essential funding for Ripple's operations and develop a speculative trading market in XRP.

100.    Ripple viewed the Institutional Sales as the lynchpin of its strategy to generate speculative interest in XRP from public investors.  As Ripple stated in a document published on its website on January 24, 2017, which Ripple Agent-2 authored, Ripple's Institutional Sales of XRP were "indicative of [XRP's] broader capital market potential."

101.    Ripple—through its agents, including Larsen and Garlinghouse—offered and sold XRP for investment to influential players in the digital asset space, including XRP market makers, dealers, and blockchain-focused private investment funds looking to create an XRP-based fund or include XRP in their fund.  These market makers were also typically not registered with the SEC.

102.    With a few exceptions, Ripple conducted the Institutional Sales through XRP II, which applied for a license with the NYDFS to engage in the "virtual currency business activity" of selling "units of Ripple's virtual currency . . . to institutional and other accredited investors" who are "purchasing XRP for speculative purposes."

103.    From 2013 to the present, Ripple has made Institutional Sales to at least twenty-six institutional investors.

104.    Ripple made many of the XRP Institutional Sales at a discount from XRP market prices.  At least seven of the institutional investors—including some described below—bought XRP at discounts between 4% and 30% to the market price

105.    The agreements governing Ripple's Institutional Sales typically provided no restrictions on the buyer's ability to resell XRP, provided only brief lock-up periods (during which the investor could not resell its XRP) of typically three to twelve months, or limited the buyer's ability to resell quantities of XRP that could potentially lower XRP's trading price.

106.    In other words, Ripple expected that most, if not all, Institutional Sales buyers would sell their XRP into public markets and tried to protect XRP's trading price by limiting the amounts that could be resold during any given time period.  By selling at discounts to market prices, Ripple incentivized these buyers to seek to sell their XRP into the public markets in order to realize what was essentially a guaranteed profit.

107.    The paragraphs below describe three examples of Institutional Sales.

108.    On June 12, 2017, Larsen and others employees met with an investment fund ("Institutional Investor A"), which Ripple Agent-2 described in a June 12, 2017 email to Ripple Agent-3 as "a $12B [$12 billion] alternative asset hedge fund based out of New York."

109.    In 2017, Ripple sold approximately 14.8 million XRP for $2.1 million to Institutional Investor A, without restricting Institutional Investor A's ability to resell this XRP into public markets in any way, at price discounts of up to 30% below XRP market prices.

110.    From at least 2016 through 2019, Ripple sold approximately 115 million XRP to an entity ("Institutional Investor B") that describes itself as a "full-service digital currency prime broker" that "provide[s] investors with a secure marketplace to trade, borrow, lend & custody digital currencies." Institutional Investor B paid Ripple approximately $6.4 million for its XRP, the first $500,000 of which it obtained at a 10% discount from XRP market prices.

111.    Under the terms of its agreement with Ripple, Institutional Investor B—whose principal place of business is in Manhattan—agreed to resell its XRP subject to volume limitations to be specified at the time of each subsequent purchase. Ripple did not restrict the entity's ability to resell XRP into the market in any other way.

112.    On September 24, 2018, Ripple entered into an agreement (as amended, "Institutional Investor C Sales Agreement"), signed by Garlinghouse with a Japanese entity ("Institutional Investor C") that describes itself as "operat[ing] sales and exchange service[s] of crypto-assets to offer safe and secure transactions of crypto-assets for as many people as possible."

113.    Pursuant to the Institutional Investor C Sales Agreement, Ripple agreed to make up to $1 billion worth of XRP available for purchases to Institutional Investor C from November 1, 2018 through November 1, 2021, $800 million of which was offered at prices discounted between 15% and 30% below XRP's market price, depending on the total amount of XRP purchased by Institutional Investor C.

114.    Pursuant to the Institutional Investor C Sales Agreement, Institutional Investor C agreed to limit the amount of its own "sales or transfers of XRP" to not exceed 10 basis points of the average daily volume of XRP trading in the market (a basis point is .0001 or 1/100th of 1%).

115. From 2018 through the end of 2019, Ripple sold over $170 million worth of XRP, approximately 719 million XRP, to Institutional Investor C, sold approximately 361 million XRP to Institutional Investor C through the end of September 2020, and at least another 20 million XRP around December 15, 2020.

116. Table 2 specifies the amounts Ripple raised in both Market and Institutional Sales:

| Year or Other Time Period | Total XRP Market Sales in USD | Total XRP Institutional Sales in USD | Total Funds Ripple Raised from Certain XRP Sales |
|---|---|---|---|
| **2013** | | $2,572,286.07 | $2,572,286.07 |
| **2014** | $2,535,979.74 | $14,722,984.79 | $17,258,964.53 |
| **2015** | $6,912,557.86 | $10,939,378.47 | $17,851,936.33 |
| **2016** | $6,239,994.34 | $10,094,945.99 | $16,334,940.32 |
| **2017** | $116,709,100.04 | $67,124,274.31 | $183,833,374.35 |
| **2018** | $362,727,751.01 | $171,715,041.56 | $534,442,792.57 |
| **2019** | $268,249,195.38 | $231,993,578.98 | $500,242,774.36 |
| **2020 (through third quarter)** | $0 | $115,689,994.15 | $115,689,994.15 |
| **Total** | **$763,374,578.38** | **$624,852,484.32** | **$1,388,227,062.70** |

Table 2: Funds Raised in Offering from Certain XRP Sales

### E. Defendants' Other XRP Distributions and "Listing" of XRP on Digital Asset Trading Platforms

117. At times, rather than directly selling XRP into the market to fund its operations, Ripple funded its dual XRP market-creating and company financing goals by transferring XRP to third parties as compensation. Ripple understood that these parties would in turn sell XRP into the public markets (often explicitly dictating the terms under which the parties could make these sales).

118. These Other XRP Distributions consist of five other types of sales and distributions of XRP in return for cash or other consideration, described below.

*1. Executive Compensation Distributions*

119. Between December 2016 and at least May 2019, Ripple granted certain of its executives a total of approximately 900 million XRP in consideration for their labor as Ripple employees, at least 597 million of which Ripple has already tendered to these executives.

120. On December 13, 2016, Ripple granted Ripple Agent-3 and Garlinghouse 150 million and 500 million XRP, respectively, in separately negotiated compensation agreements.

121. Ripple granted Garlinghouse an additional 250 million XRP on May 29, 2019.

122. Pursuant to the terms of these agreements, Ripple has transferred approximately 521 million XRP to Garlinghouse and approximately 76 million XRP to Ripple Agent-3, worth approximately $246 million and $44 million, respectively, at the time of transfer.[1]

2. *On-Demand Liquidity Distributions*

123. As described below, in late 2018 Ripple began to market a product ("On-Demand Liquidity" or "ODL," also called "xRapid") for money transmitting businesses to buy XRP in one jurisdiction, transfer it to a separate destination, and sell XRP for the local fiat currency, to effect cross-border payments. To encourage adoption of ODL, Ripple paid XRP to both the money transmitting businesses and certain market makers that supported the product for their efforts.

124. Ripple chose to compensate these entities (which were not investors in XRP) with XRP directly, understanding that they would monetize their fees by selling XRP into public markets.

125. From approximately December 2018 through July 2020, Ripple issued at least 324 million XRP as fees, rebates, and incentives to entities associated with ODL, without restricting the ability of these entities to resell the XRP received as incentives into public markets. This XRP was valued at approximately $67 million at the time of Ripple's payments.

126. These entities typically have resold all the XRP they have received from Ripple to investors in the public markets, typically on the same day that they received the XRP from Ripple.

127. Ripple took no steps to ensure that these entities intended to hold XRP as an investment. To the contrary, Ripple gave these entities XRP to sell into the public markets.

---

[1] These values are based on the weighted average of XRP's closing price for a particular day, month, or quarter, as reported by the digital asset platform Coinmarketcap.

3. *Sales of XRP into the Market on Behalf of a Larsen-Established Entity and by Ripple-Funded Projects.*

   (i)   *RippleWorks*

128.   In 2015 and 2017, Ripple issued at least 2 billion XRP as contributions to "RippleWorks," an entity Larsen co-founded to invest in, among other things, XRP-related projects to further Ripple's goals of achieving widespread trading of XRP in the market.[2]

129.   Larsen co-founded RippleWorks with another individual who would become its CEO (the "RippleWorks CEO") in mid-2015. Larsen donated one billion of his own XRP to RippleWorks, and Ripple's Board, including Larsen, approved giving 1 billion XRP to RippleWorks, in part because the Board "believe[d] [RippleWorks] will help promote [Ripple's] business." On February 1, 2017, Ripple committed an additional one billion XRP to RippleWorks.

130.   RippleWorks worked to achieve Ripple's own goal of widespread distributions of XRP, with Larsen supervising RippleWorks' sales of XRP into the market.

131.   Ripple took no steps to ensure that RippleWorks intended to hold XRP as an investment. To the contrary, Ripple gave XRP to RippleWorks so it would sell XRP into the public markets and, from mid-2015 to the present, enlisted the Market Maker to sell approximately 693 million XRP to the public on RippleWorks' behalf, for approximately $176 million.

132.   A November 11, 2016 email from the RippleWorks CEO to Larsen and Garlinghouse exemplifies the relationship between the two entities. In the email, the RippleWorks CEO detailed RippleWorks' "2016 Year End XRP selling" and "2017 XRP Sales" in order to "insure [sic] we are all on the same page and allow anyone to chime in with any different thoughts."

---

[2]   In a November 21, 2019 tweet, Larsen explained that RippleWorks had "distribute[d] $25M+" to a number of ventures, which then presumptively resold the XRP into public markets.

133.    Another example involves RippleWorks' eventual investment into a fund that wished to invest in digital assets (the "XRP Fund") and Ripple's "loan" of XRP to that fund so that it could engage in market-making activities.

134.    In an August 27, 2017 weekly update email, Ripple Agent-3 informed Garlinghouse that the XRP Fund and Ripple had exchanged a term sheet.

135.    In an October 2, 2017 weekly update email, Ripple Agent-3 informed Garlinghouse that Ripple was "evaluating setting up [an investment in the XRP Fund] through RippleWorks."

136.    On November 1, 2017, Ripple Agent-3 informed Ripple Agent-2 that Ripple was looking to "accelerate/prioritize XRP-beneficial announcements," including potentially the formation of the XRP Fund.

137.    On November 11, 2017, a Ripple marketing executive asked Garlinghouse and Ripple Agent-3 in an email if they could use an upcoming investment conference in Manhattan to "push" the XRP Fund or the RippleWorks CEO "to close so we can announce."  The next day, Ripple Agent-3 informed Garlinghouse that Ripple was "following up with [the RippleWorks CEO] with some provisions [for the XRP Fund] to prevent harmful XRP behavior."

*(ii) Third-Party Incentives Through "xPring"*

138.    From approximately April 2018 through August 2020, Ripple publicly marketed an initiative it called "xPring," through which it distributed over 776 million XRP to at least 27 different entities or projects with the shared expectation that the entities would resell XRP to further Ripple's goals of achieving widespread XRP distribution.  Ripple called xPring "a new initiative by Ripple that will invest in, incubate, acquire and provide grants to companies and projects run by proven entrepreneurs" in hopes of achieving Ripple's stated goal of working to develop a use for XRP.

139.    Ripple used xPring as yet another way to get XRP into the hands of public investors through conduits, while obtaining the added benefit of incentivizing third parties to help Ripple

pursue its XRP goals. Ripple gave XRP to these entities so they would sell it into public markets and took no steps to ensure that xPring-funded parties would not resell their XRP to the public.

140. For example, a November 1, 2018, two-year "Services and Marketing Agreement" with one entity promised "certain development services to promote technologies of interest to Ripple." The agreement provided that the entity would receive a bi-monthly "development service fee" of 5 million XRP and could identify additional parties that could receive XRP as incentives— provided that these additional parties agreed to abide by Ripple-mandated parameters for their XRP trading volumes. By August 2020, Ripple had paid the entity at least 364 million XRP, of which the entity had distributed 178 million to other parties, typically approved by Ripple.

141. Another such distribution included a November 8, 2018 agreement wherein Ripple agreed to pay a company up to $17.5 million in XRP if the company met certain "milestones" relating to the "integration" of XRP into the company's systems. Understanding the business reality that the company would seek to resell the XRP it received from Ripple, Ripple again required the entity to agree to certain volume-related parameters to effect XRP sales into the market. Ripple eventually transferred more than 163 million XRP to this entity.

### 4. The XRP Options

142. From January 2018 through December 2019, Ripple sold at least 1.63 billion XRP when certain entities exercised options to buy XRP that Ripple had granted (the "Option Sales").

143. In February 2016, Ripple granted "an option to purchase units of Ripple XRP" to a California-based fund ("Option Investor A") that invests in technology-related startups "[i]n exchange for advisory services provided" to Ripple by Option Investor A's founder. Ripple granted options for up to one billion XRP as of January 1, 2014, at prices to be determined based on XRP's average market prices. The options are from January 1, 2018, and for each month thereafter, until

March 1, 2022. Between 2018 and September 2020, Ripple's sales to Option Investor A consisted of at least 588 million XRP.

144.    Separately, in 2016, Ripple entered into an agreement with an enterprise software firm ("Option Investor B") based in Manhattan that gave the firm an option to buy up to 5 billion XRP at a discounted price in exchange for efforts to help Ripple develop a "use" for XRP. The amount of XRP available for purchase under the option was later reduced, and Option Investor B purchased at least 1.04 billion XRP in 2019.[3]

5.    *Payments to Digital Asset Trading Platforms to Support XRP's Trading Market*

145.    In 2017 and 2018, Ripple also entered into agreements with at least ten digital asset trading platforms—none of which were registered with the SEC in any capacity, and at least two of which have principal places of business in the United States—providing for listing and trading incentives with respect to XRP. Ripple paid these platforms a fee, typically in XRP, to permit the buying and selling of XRP on their systems and sometimes incentives for achieving volume metrics.

146.    As just one example of these arrangements, in May 2017, Ripple gave a digital asset trading platform, based in the United States, 17 million XRP in exchange for the platform's agreement to make XRP available to buy and sell on its platform, as well as rebates on trading fees of up to $60,000 per month for three months, and up to $150,000 in incentive payments per month for three months to the top three traders of XRP for other assets on the platform.

147.    Between October 2016 and October 2017, Ripple distributed approximately 28 million XRP to these platforms, with a then-current market value of $6.8 million.

---

[3]    To pressure Option Investor B to sell back the option grant (which covered approximately 5% of the XRP in existence at a reduced price), Ripple Agent-3 suggested to Ripple Agent-2 in an email on February 26, 2017 that Ripple make the option public. Ripple Agent-2 responded that it "would cause us some headaches . . . Better to keep it private."

148.    As reflected in internal documents, Ripple made these efforts because it believed that increased trading volume for XRP on digital asset trading platforms would create "momentum" for XRP.  For example, as Ripple Agent-3 instructed a Ripple employee and an XRP investor in June 2017, Ripple had to "load[ ] with ultimatums" any conversation with one particular Manhattan-based digital asset trading platform, because it was a "HIGH VALUE target" for Ripple.

149.    Ripple tried repeatedly and unsuccessfully to persuade that digital asset trading firm to "list XRP on [its] exchange" by offering to "cover implementation costs, paying rebates, [and] brokering intros to large XRP holders for custody."  Undaunted by these initial failures, Ripple Agent-3 emailed the two owners of the firm directly in July 2017, copying Garlinghouse, and asked: "Does a $1M cash payment move the needle for a Q3 listing?"

150.    Table 3, below, summarizes the Other XRP Distributions.

| Type of Other Distribution in the Offering | Time Period | Amount of XRP Sold (or Exchanged for Other Consideration) in the Offering |
|---|---|---|
| Executive Compensation | Dec. 2016 to Dec. 2019 | 597,000,000 |
| On-Demand Liquidity Distributions | Dec. 2018 to July 2020 | 324,000,000 |
| RippleWorks | Third Quarter 2015 – Present | 693,000,000 |
| xPring | Apr. 2018 to Aug. 2020 | 776,000,000 |
| Option Sales | Nov. 2018 to Sept. 2020 | 1,637,000,000 |
| Digital Asset Trading Platforms | Oct. 2016 to Oct. 2017 | 28,400,000 |
| Total | | 4,055,400,000 |

**Table 3: Other XRP Distributions**

**F.    Larsen's and Garlinghouse's Sales of XRP**

*1.    Larsen's Sales*

151.    At all relevant times, Larsen was either the CEO or chairman of the Board of Directors of Ripple and thus part of the control group of XRP's issuer.

152.    While CEO, Larsen had the power to appoint six out of eight seats on Ripple's Board of Directors, and, as Ripple's largest equity shareholder, had 68% of its voting power.

153.    The following sales of XRP took place with Larsen working in coordination with Ripple to develop and maintain a liquid market for XRP through which Defendants could monetize their holdings.  Email between Larsen and the Market Maker, from at least 2017 through at least 2019, show that, like Ripple and Garlinghouse, Larsen also attempted to strike a delicate balance between maximizing profits from his XRP sales while not depressing the price of XRP.

154.    Larsen at times paid the Market Maker to make offers and sales of his XRP on digital asset trading platforms with worldwide operations and customers.  Larsen offered and sold his XRP to investors all over the world, including in the United States, without marketing or restricting offers or sales to persons who had a "use" for XRP and without restricting purchasers from reselling their XRP to other investors, including to investors in the United States or elsewhere.

155.    Larsen and his wife netted approximately $450 million from these sales.

156.    Larsen directed his offers and sales of XRP from within the United States.

157.    Larsen intends to continue selling his XRP, as shown in an email he sent an investor on June 30, 2019.  The investor had raised concerns about Larsen's continued personal sales of XRP, to which Larsen described the "widely held view that over time, its [sic] better to have widely held assets, so continued reduction of Ripple and founder holdings is likely constructive."  On September 22, 2020, Larsen also publicly confirmed from his Twitter account that he had transferred half a billion of his XRP, then worth approximately $115 million, to accounts he

established with a digital asset firm incorporated in New York, and recently did in fact make such transfers, further evidencing his present intention to continue his unregistered sales of XRP.

    *2.*    *Garlinghouse's Sales*

158.    From April 2015 to the present, Garlinghouse was either the COO or the CEO of Ripple and thus part of the control group of XRP's issuer.

159.    After Garlinghouse joined Ripple in 2015, Garlinghouse was awarded XRP from Ripple, aligning his financial incentives with Ripple's. Garlinghouse later resold significant quantities of XRP to amass profits well over one hundred million dollars.

160.    The following sales took place with Garlinghouse working in coordination with Ripple to develop and maintain a liquid XRP market that the Defendants could monetize.

161.    From April 2017 through December 2019, Garlinghouse sold over 321 million of his XRP, for approximately $150 million, to the public through digital asset trading platforms or other intermediaries. Beginning in December 2017, Garlinghouse used the Market Maker, who deployed trading bots on multiple, worldwide digital asset trading platforms, to sell his XRP to the public.

162.    Garlinghouse offered and sold XRP to investors all over the world, including in the United States, without marketing or restricting offers or sales to persons who had a "use" for XRP and without restricting purchasers from reselling their XRP to other investors, including to investors in the United States or elsewhere.

163.    Garlinghouse directed his offers and sales of XRP from within the United States.

164.    At various times between April 2017 and at least December 2019, Garlinghouse also paused his XRP sales at the Market Maker's recommendation because XRP's market price was falling, seeking to avoid having the latter's own XRP sales further drive down XRP's market price.

165.    Recently, Garlinghouse transferred some of his XRP into accounts he opened with digital asset trading platforms, evidencing his intention to continue his unregistered sales of XRP.

III.    **Defendants Created and Control the XRP Trading Markets While Selectively Disclosing Information about Their Activities**

166.    Defendants' offers and sales of XRP in the Offering occurred into a market that they had largely created and which—consistent with their dual purposes of raising funds from their XRP sales and managing the liquidity of the XRP market—they played a significant role overseeing.

167.    Defendants' efforts in this regard principally involved monitoring the timing and amount of their XRP sales and purchases, sometimes to coincide with strategic announcements about Ripple or XRP, and establishing an escrow for Ripple's own XRP holdings.

168.    The ability to sell investments in liquid markets is an important consideration for investors when determining whether to buy securities because it represents one way in which they can realize profits from their investments.

A.    **Ripple Managed the Price and Liquidity in the XRP Market**

169.    Throughout the Offering, Ripple—as Garlinghouse and Larsen directed at various times—undertook significant efforts to monitor, manage, and impact the XRP trading markets, including the trading price and volume of XRP.

170.    As described in Section II, these efforts included:  (1) using algorithms to time the amount and price of Defendants' XRP sales into the market; (2) paying incentives to certain market makers—some of which Ripple engaged to effect the Market Sales—if the sales reached certain trading volume levels on XRP; and (3) paying digital asset trading platforms to permit XRP trading.

171.    These efforts also included timing the prices and amounts of XRP sales to achieve what Ripple viewed as desirable trading volume or price levels and fluctuations with respect to XRP. Ripple sought to maximize the amount it could earn from the XRP Market Sales while minimizing volatility and any downward pressure on XRP's market price caused by Ripple's constant injections of new XRP into the market to raise operating funds.

172.     Ripple internally described these strategies as aimed at maximizing the amount of money Ripple could raise in the Offering or at achieving "more speculative [XRP] volume."  At times, Ripple publicly described its efforts as meant to protect the public's investments in XRP.

173.     Starting in late 2015, Ripple directed the Market Maker to buy or sell XRP (on occasion strategically timed around Ripple announcements), to account for the volume impact of XRP trading, as a Ripple executive told the Market Maker by email on September 20, 2016.

174.     To accomplish this, Ripple had an internal "XRP Markets Team" that monitored XRP's price and volume daily and regularly communicated with Ripple's XRP market makers about Ripple's XRP sales strategy, which relied on selling XRP in amounts no greater than a certain percentage of XRP's daily volume, generally between 10 and 25 basis points.

175.     Starting in 2017 at the latest, Larsen and Garlinghouse participated in meetings with, or were apprised of discussions by, the XRP Markets Team, in which they discussed adjustments to Ripple's sales strategy and recommendations regarding the amount of Ripple's XRP to sell, decisions over which Larsen and Garlinghouse had final authority as Ripple's CEOs.

176.     On April 11, 2016, Ripple also directed the Market Maker to buy XRP in the open market with the goal of "[t]arget[ing] $0.008 incrementally over the course of 2 days" while "[c]ap[ping] activity at 5% of daily trading volume[,]" among other things.

177.     A few months later, on August 16, 2016, a Ripple employee reported to others at Ripple the "robust discussion activity [he had seen] on the XRPchat thread" (which included "[p]ositive feedback" with respect to "[u]nderstanding that Ripple has a long-term strategy, in which XRP is one of a few big bets") and the "notable market activity" for XRP in recent days.  ("XRP Chat is an online forum that describes itself as "[t]he Largest XRP and Ripple Community Forum".)

178.     A Ripple vice president of finance (the "VP of Finance") then asked Garlinghouse and Ripple Agent-3 "if [they] discussed whether we should turn off the buying now with this news

and the higher volume?"  Ripple Agent-3 responded:  "The thesis . . . is to show a period of consistent buying from an account that is known to be a consistent seller.  The intended impact of the buying is not to move the price but rather to provide confidence in the market, which in turn will move the price."

179.     Following this exchange, Ripple did not "turn off the buying" of XRP.

180.     The following month, September 2016, Ripple directed the Market Maker to place XRP buy and sell orders around the time of announcements Ripple made that month referring to Ripple's achievements, though neither announcement concerned XRP.

181.     On September 20, 2016, the VP of Finance emailed the Market Maker and said that, after consultation with Garlinghouse and Larsen, Ripple wanted to "better understand[ ] the impact of our purchases [of XRP] over the past week" and that Ripple's "[c]urrent thinking [was] that we should use our full $300k [designated for XRP purchases] in the first 24 hours post announcement."

182.     The next day, the Market Maker provided the VP of Finance and Ripple Agent-3 with data showing "the positive relationship between hourly price changes of XRP and the hourly Net XRP purchases," while noting the lack of data to provide a "statistically significant result."

183.     On Friday, September 23, 2016, the VP of Finance, after consulting with Garlinghouse and Larsen and obtaining Garlinghouse's "go ahead," directed the Market Maker to "keep the buying light [the day after the announcement] and then do the bigger slug starting Sunday."  The Market Maker agreed.

184.     On Monday, September 26, 2016, the Market Maker reported to Ripple that it had "spent approximately $200K of the second tranche" and recommended a strategy "to make aggressive markets" going forward, to which the VP of Finance agreed.

185.     On October 15, 2016, the VP of Finance informed the Market Maker that, after an upcoming announcement, Ripple "would like to go to sales at 1%" of trading volume and asked the

Market Maker to "be thoughtful / opportunistic around the timing of implementing 1%" because Ripple did not "want to depress the rally but rather capitalize on the additional volume." He further instructed the Marker Maker "to take more money off the table," if there was a chance to do so.

186. Internally, Ripple executives frequently expressed concern over XRP's price and planned proactive steps to protect the market.

187. For example, in an August 12, 2017 e-mail to Ripple Agent-2 and Ripple Agent-3, Garlinghouse raised concerns about XRP being "squarely left out" of a recent market "rally" and asked whether Ripple's recent XRP sales were "impacting the market?" He instructed certain Ripple employees to "proactively" attempt to increase speculative trading value with positive XRP news.

188. Similarly, in September 2019, Ripple's "Head of Global Institutional Markets" reminded certain Ripple employees that Ripple viewed itself as "Responsible Stewards of XRP." She expressed concerns about the impact on XRP's price from increased XRP supply and recommended "buy[ing] [XRP] back" because she was very "worried about xrp at 0.20" and was "DREAD[ING]" an upcoming report—referring to quarterly reports Ripple began publishing in January 2017 (the "Markets Reports")—if Ripple didn't "take swift, creative action now (!)"

189. Defendants did not disclose publicly this XRP buying and selling strategy.

190. But Ripple did publicly tout other actions it was taking to support XRP's market price, including to limit XRP supply or to create scarcity through XRP buybacks.

191. For example, on January 4, 2017, in an effort to assuage XRP investor concerns, Ripple told Institutional Investor C that Ripple "only sells or transfers XRP to financial institutions and accredited investors who bring payment volume and/or FX liquidity to Ripple." Ripple made similar statements publicly, such as on its website, the "XRP Chat," and certain Markets Reports.

192. Similarly, in its Markets Report for the fourth quarter of 2017, Ripple told investors that it placed sales volume "restrictions" on the XRP it sold directly to financial institutions to "mitigate the risk of market instability due to potential subsequent large sales."

193. Later, in approximately June 2020, Ripple employees prepared and delivered an internal presentation for Garlinghouse and Larsen in which the employees highlighted that "XRP began underperforming [Bitcoin]" since early May 2020, partly because of Ripple's sales of XRP. The employees proposed "supply limiting tactics," such as Ripple's buying back XRP.

194. Garlinghouse approved the "buy back" option.

195. Following Garlinghouse's decision, Ripple disclosed on November 5, 2020, in its Markets Report for the third quarter of 2020, that it had purchased $45 million worth of XRP in order to "support healthy markets" and that it may continue to engage in this activity in the future.

**B. Defendants Established an XRP Escrow**

196. XRP investors became concerned that Ripple's sales could cause XRP's price to crash. As Garlinghouse explained in an internal email on May 16, 2017, XRP investors were concerned that Ripple could "sell its [then] 61.68[ ]B[illion] XRP in the market at any time."

197. If Ripple had filed a registration statement and quarterly and annual reports—as it would have been required to do—Ripple's sales would have been publicly disclosed. They were not.

198. To assuage investor concerns, on May 16, 2017, Ripple announced that it would place 55 billion XRP (most of its current holdings) into a cryptographically-secured escrow that would restrict Ripple to accessing only one billion XRP every month (the "XRP Escrow").

199. Both Larsen and Garlinghouse were instrumental to the formation of the XRP Escrow by developing and, ultimately, approving the idea.

200. An internal Ripple memo prepared by Ripple Agent-3 around April or May 2017 (the "Proposal to Escrow Ripple's XRP") explained that one purpose of the escrow was to "secur[e]

speculative liquidity" in XRP and to "drive a material increase in XRP trading volume/liquidity" by removing uncertainty about when Ripple might dispose of its XRP holdings.

201.    The Proposal to Escrow Ripple's XRP noted that Ripple wanted "more XRP liquidity and [that its] efforts are helping, [but] things are not moving as fast as [Ripple] want[s]."

202.    The Proposal to Escrow Ripple's XRP concluded that the XRP Escrow would be successful if it resulted in "immediate increase in volume and price appreciation" for XRP as one of the "[r]ewards" to counter-balance the increased "[r]isk" of "Cash flow shortfall" for Ripple.

203.    Ripple and Garlinghouse publicly touted the formation of the XRP Escrow as proof that Ripple and XRP holders shared a common interest in the success of Ripple's efforts as to XRP and as one of Ripple's many efforts to manage the trading market for XRP.

204.    In other words, by announcing the XRP Escrow, Defendants sought to encourage investors to buy and sell XRP without fear that Ripple could cause XRP's price to crash—as though the XRP market was a functional market subject to ordinary supply and demand independent of the issuer.  In doing so, Defendants reminded investors of a fact they already knew—that Ripple was committed to undertaking efforts to increase XRP trading volume while supporting XRP's price.

**IV.    XRP Was a Security Throughout the Offering**

205.    As noted, the Supreme Court made clear in its *Howey* decision of 1946 that the definition of whether an instrument is an investment contract and therefore a security is a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

206.    At all relevant times during the Offering, XRP was an investment contract and therefore a security subject to the registration requirements of the federal securities laws.

207.    Defendants understood and acknowledged in non-public communications that the principal reason for anyone to buy XRP was to speculate on it as an investment.

208.    For example, Ripple Agent-3 stated in an internal document called the "XRP Distribution Framework," which he forwarded to at least one member of Ripple's Board of Directors on November 20, 2013, that "[s]peculators are speculating on Ripple Labs" and that, "[i]f you are holding xrp you should want [Ripple Labs] to retain xrp for business development." Ripple acknowledged not only that XRP holders were speculating on Ripple's ability to deploy XRP to develop its business, but also that Ripple's interests aligned with other XRP holders' interests.

209.    Similarly, on December 7, 2015, Ripple requested that the issuer of a fund created to generate investor exposure to XRP (through XRP Ripple sold to the fund), disclose the risk that XRP could be deemed a security under the federal securities laws. Specifically, Ripple requested that the following language be added to the risk disclosures for the fund:

> The Ripple ecosystem's reliance on the efforts of Ripple Labs – the single largest holder of XRP – to promote and expand the ecosystem, creates greater risk that XRP might be deemed a security as compared to other virtual currencies and Ripple Labs might be deemed to be operating as an unregistered securities exchange, broker, or dealer under federal and State securities laws.

210.    Similarly, in its official application to the NYDFS for XRP II in 2016, Ripple acknowledged that buyers were "purchasing XRP for speculative purposes."

211.    Later, in July 2019, a Ripple senior vice president emailed the CEO of the United States branch of a digital asset trading firm with which Ripple sought to make XRP available for trading. In his email, the Ripple executive explained: "The primary use case for XRP today is speculative and the exchanges . . . are the main enabler of this use case."

212.    Sophisticated investors agreed. For example, a hedge fund, to which Ripple sold XRP, explained to the fund's investors this economic reality in offering materials from March 2015: "The increase in XRP value is heavily dependent on the success of Ripple."

213.    Consistent with its privately-stated understanding, Ripple publicly offered and sold XRP as an investment into a common enterprise that included Ripple's promises to undertake

significant entrepreneurial and managerial efforts, including to create a liquid market for XRP, which would in turn increase demand for XRP and therefore its price.

214. Starting in at least 2013 and through the Offering, Defendants made statements promoting XRP as described in the preceding paragraph in a variety of publicly available media, including Twitter, YouTube, major financial news networks, industry conferences, the XRP Chat, an online discussion forum and an informational posting about Ripple that it hosted on its website (but since deleted) called "Ripple Forum" and "Ripple Wiki," respectively, and the Markets Reports.

215. In fact, throughout the Offering, Ripple held itself out as the primary source of information on XRP. Ripple's website contained select information about how and where to buy XRP, XRP market data, and news and insights related to XRP. In the Markets Reports for the third quarter of 2019, Ripple made clear it would "take proactive steps" to address the "spread of misinformation" about Ripple's alleged "dumping" of XRP and to address the "fear, uncertainty, and doubt" about investing in XRP spread by others. Ripple thus held itself out as the legitimate source of information essential for investors, inviting them to rely on what Ripple chose to disclose.

216. Based on these representations, Ripple's actions, and the economic reality, XRP investors in the Offering had a reasonable expectation of profiting from Ripple's efforts to deploy investor funds to create a use for XRP and bring demand and value to their common enterprise.

### A. Ripple Led Investors to Reasonably Expect that Ripple's and Its Agents' Entrepreneurial and Managerial Efforts Would Drive the Success or Failure of Ripple's XRP Projects

217. Defendants repeatedly stated publicly that they would undertake significant efforts to develop and foster "uses" for XRP, so that banks, financial intermediaries, or other specialized money transmitting businesses would want to buy it, including as alleged above in Section II. (The identity of the "users" to whom it would position XRP varied over the years as Ripple explored different strategies.)

218.     Defendants also persistently stated publicly that—partly to achieve the goal of widespread XRP trading—they would take steps to create, promote, and protect the market for trading in XRP, such as managing the manner in which Ripple bought and sold XRP, and by persuading digital asset trading platforms to permit investors to buy and sell XRP.  These statements led reasonable investors to expect to profit from Ripple's efforts on behalf of XRP.

  *1. Defendants Promised to Undertake Significant Efforts to Build Value for XRP*

219.     From the outset of the Offering, Defendants publicly promised significant, meaningful entrepreneurial efforts with respect to XRP.

220.     In an April 14, 2014 interview published online, Larsen explained that Ripple was "helping to build in the Ripple protocol . . . the idea of an Internet-for-value exchange," and that Ripple saw "this as a SWIFT 2.0," referring to the established inter-bank payment network.

221.     In approximately April 2014, Ripple created *"The Ripple Protocol: A Deep Dive for Financial Professionals"* (the "2014 Promotional Document"), which Ripple distributed publicly.

222.     In the 2014 Promotional Document, Ripple purported to examine the "Sources of XRP Demand."  Ripple stated that "Ripple Labs' business model is predicated on a belief that demand for XRP will increase (resulting in price appreciation) if the Ripple protocol becomes widely adopted."  Ripple acknowledged that "[t]he Ripple network [was] still in its infancy and relatively unknown," but predicted "increased speculative interest, which may have significant impacts on price," if the Ripple network became more well-known or used, in which case Ripple concluded that it "expect[ed] the demand for XRP to be considerable."

223.     In the 2014 Promotional Document, Ripple held itself out the key party who would make these efforts with respect to XRP and the Ripple protocol, including by promising to "distribute [certain XRP] to incent the participation of market makers, gateways and consumers to utilize the protocol," and highlighting Ripple's past "business development efforts."  Ripple also

noted that it had recruited a "diverse set of talented individuals with experience in relevant technology and financial services companies" for these efforts and would enlist others to assist.

224.    Ripple repeated these types of promotional statements throughout the Offering.

225.    On June 3, 2016, Cryptographer-1 explained in the XRP Chat, in response to the question "if Ripple Failed, XRP died?", that he didn't "think it's likely XRP would succeed without us, though it's possible."  But, he continued, while "there are significant technical obstacles to using XRP as a bridge or vehicle currency[,] . . . [o]ur XRP strategy is based on promoting it as a bridging currency . . . through various strategies including paying traders an incentive."

226.    On January 21, 2017, Cryptographer-1 represented in the XRP Chat that Ripple was "heavily focused" on "building up an awesome payments infrastructure" using XRP and had "several strategies" to do so.  Months later, on September 12, 2017, he posted on Reddit that Ripple had previously explained that it "will work to get XRP adopted for th[e] purpose" of serving as a "new intermediary asset" and noted "why that would be expected to create demand for XRP."

227.    In an email to Ripple's equity shareholders, advisors, and others on June 5, 2017, Garlinghouse emphasized Ripple's efforts to increase XRP's liquidity and price through the XRP Escrow, among other things (with emphases added):

> [Ripple has] proactively addressed two key objections to XRP, . . . announcing our commitment to lock up the lion's share of our XRP in a cryptographically secured escrow account. . . .  Despite a proven **track record of being good stewards for XRP**, we had continued to hear concerns in the market that Ripple could (hypothetically) sell our 61 billion XRP at any time **– a scenario that would certainly be bad for Ripple**!  So with the decision to lock up 55 billion XRP in escrow, **we have given investors a predictable supply schedule** and removed what skeptics have suggested has been a barrier to broad XRP adoption. . . .  **This recognition has translated into significant improvements in both the liquidity (trading volume) and price of XRP**.  We saw nearly $6 billion in trading volume in May alone and XRP is now hovering around $0.30, **up approximately 500 percent in the last 30 days and over 5,000 percent from the beginning of 2017**! . . .  In fact, factoring in the approx. $18 billion of XRP we own, Ripple is worth more than all but four US start-ups.

228.     In the same email, Garlinghouse reminded Ripple's equity investors and advisors that Ripple remained "committed to making XRP the best digital asset for payments" and that XRP had "technical superiority compared to other digital assets."

229.     Garlinghouse had made statements similar to these in an article posted on Ripple's website on May 16, 2017.  A few months later, in a December 7, 2017 post on its website, Ripple, confirming the formation of the XRP Escrow, once more reiterated Garlinghouse's statements in the May 16, 2017 article and the June 5, 2017 email, described above.

230.     In a December 14, 2017 public interview, Garlinghouse explained Ripple's market monitoring priorities as follows:  "Priority one is definitely around volume.  Priority two, I would say, is XRP liquidity.  Making sure . . . we are doing everything we can to make the XRP ecosystem successful on a liquidity basis.  Priority three which admittedly is kind of a newer priority and something we'll work on more in 2018, is investing in other use cases for the XRP Ledger."

231.     In the Markets Report for the fourth quarter of 2017, Ripple stated that "it's clear Ripple's consistent steadfast support of XRP is a major advantage as the payments industry continues to seriously consider [XRP] as an alternate liquidity solution."  A Ripple executive similarly explained his view in a Yahoo! Finance interview on approximately March 15, 2018, that "the activities of the software company create value in . . . [XRP]."

232.     Also in the Markets Report for the fourth quarter of 2017, Ripple announced its upcoming intended efforts to "work towards the launch of institutional hedging instruments and custody solutions," which "are important to institutional adoption [*i.e.*, key forces in achieving liquidity and price increases] and thus are important components of our 2018 roadmap."

233.     On September 11, 2017, Cryptographer-1 told public markets via a post on Reddit that, because "Ripple holds more than half the XRP in existence[,] . . . Ripple can justify spending $100 million dollars on something if it would be expected to increase the long term price of XRP by

a penny." Then, on November 17, 2017, he posted on Reddit about why Ripple had an incentive to continue these efforts and why it would continue these efforts: "[T]here is no rational reason why [Ripple] would not continue to execute [its] publicly announced strategy and do everything we can to maximize the price of XRP over at least the time it takes us to sell the XRP we have."

234.     On January 17, 2018, Garlinghouse tweeted an article he said was "[a] good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

235.     On February 17, 2020, Garlinghouse tied Ripple's efforts to create "use"-driven demand for XRP to a potential for an increase in XRP price, in an interview on the floor of the New York Stock Exchange in Manhattan (the "NYSE Interview").

236.     In the NYSE Interview, Garlinghouse answered questions about the price of digital assets by predicting that markets would move "from that speculation that has driven the crypto market to utility." He stated that increased "use" of XRP had generated liquidity in the market for XRP and that "liquidity begets liquidity," such that market markers "see liquidity and they realize 'hey there is an opportunity there'." Tying this to Ripple's significant efforts, Garlinghouse promised: "Over the coming years . . . we Ripple are focused on driving utility from this asset and if we are successful at that we think that is good for the liquidity of the whole ecosystem."

   2.     *Defendants Promised to Undertake Significant Efforts to Develop and Maintain a Public Market for XRP Investors to Resell XRP*

237.     Starting in at least 2014, Ripple also promised that it would undertake efforts to create, maintain, and protect secondary resale markets for XRP.

238.     For example, starting in 2014, Ripple stated on its website: "[W]e will engage in distribution strategies that we expect will result in a stable or strengthening XRP exchange rate against other currencies." Years later, in announcing the XRP Escrow, Ripple reminded investors that it "engaged in distribution strategies that we expect will result in a strengthening XRP exchange rate against other currencies," touting its "proven [four-year] track record of doing just that."

239. In a February 19, 2014 public interview, Larsen explained that one of Ripple's "key roles is making sure that we distribute [XRP] as broadly in a way that adds as much utility and liquidity as we possibly can." He stated that he thought "our incentives are very well aligned . . . that for Ripple Labs to do well we have to do a very good job in protecting the value of XRP and the value of the network, and that really is the guiding principle here in our distribution of XRP."

240. In a May 16, 2017 article on Ripple's website, Garlinghouse reminded investors that, "[t]o build XRP liquidity, we have been mindful over the years about how we distribute XRP. Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity." He concluded that, to incentivize financial institutions, payment providers, and banks to "use" XRP (though none had up to that point), Ripple "remain[ed] committed to increasing XRP liquidity."

241. In the Markets Report for the second quarter of 2019, Ripple promised to "focus institutional sales on markets where the on-exchange liquidity for XRP is insufficient to meet institutional demand," which the report said was similar to what the company had done in 2017, purportedly leading to increased liquidity and "listings" on digital asset trading platforms in general.

242. In the Markets Report for the second quarter of 2020, Ripple explained that, as part of its "responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary market to ensure a "healthy, orderly XRP market."

243. Defendants engaged in many of these publicly-promised efforts with respect to XRP markets, as alleged in Section III, above.

*3.      Ripple Touted the Ability of Its Team to Succeed in Its Promised Efforts*

244. In connection with the efforts Defendants promised the markets they would undertake, Ripple at times highlighted the experience, expertise, and abilities of the "team" it had assembled, which included Ripple employees, business partners, and other agents.

245.    In 2013, Ripple Agent-1 explained in the Ripple Forum that Ripple's fundraising efforts through selling XRP "allows Ripple Labs to have a spectacularly skilled team to develop and promote the Ripple protocol and network."

246.    In a Reddit post in 2017, Cryptographer-1 was asked to explain if there was a risk that "XRP Will Go to 0." He explained "the biggest risks," from his perspective, included that Ripple's executives would stop working on XRP and that "[s]omeone else does almost exactly the same thing Ripple does, but does it better." He noted that this last risk was "mitigated by the fact that Ripple has such talented people and has a lead."

*4.    Ripple Publicly Touted the Efforts That It Did Actually Undertake*

247.    During the Offering, not only did Ripple *promise* efforts that could lead to the increase in value of XRP, it actually *made and touted* extensive entrepreneurial and managerial efforts—made with proceeds from the Offering—to the market.

248.    In its 2016 "Year In Review" summary, posted on its website on December 28, 2016, Ripple reminded readers of its January 2016 announcement of a joint venture to distribute "Ripple's solutions" in certain countries and a February report on "how the use of Ripple's enterprise solution and XRP can significantly impact a bank's operational costs." Although Ripple had not sold a single XRP to any "user," Ripple commented that "[g]ood news for XRP kept coming later in the spring" with the announcement of a partnership with a facility to trade in XRP derivatives.

249.    In the first Markets Report, published on January 24, 2017, Ripple touted its announcement of XRP investors' ability to buy and sell XRP on a new digital asset trading platform as "part of a continued effort to expand the XRP ecosystem."

250.    On February 15, 2017, Ripple Agent-2 tweeted a link to an article, posted on a digital asset discussion blog, about Ripple's efforts to enlist companies to assist in its managerial efforts as

to XRP. The article discussed Ripple's efforts to select a partner to help it build "functionality for XRP" and directed readers to Ripple's website on "How to Buy XRP."

251. As alleged above in Sections III and IV.A.1, Ripple and Garlinghouse made many statements in connection with the announcement of the XRP Escrow, reminding investors that Ripple had been a good "steward" of XRP, purportedly based on the ways Ripple had chosen to make its own market sales of XRP.

252. In an interview on Bloomberg News Network ("Bloomberg News") in approximately December 2017, Garlinghouse explained that XRP's price had risen because Ripple was "solving a real problem . . . a multi-trillion dollar problem around cross-border payments . . . and people have gotten excited." Pressed about "speculation" in the digital asset space and XRP investor "expectations" from Ripple, Garlinghouse explained:

> [T]he value of digital assets will be driven by their utility, if they're solving a real problem . . . then there will be demand for the tokens, the price of the tokens will go up. For XRP, we've seen because it's . . . something that can really reduce the friction, and we're talking about a multi-trillion dollar problem . . . yes, there's going to be demand for that, when you have fixed supply . . . and you see increase in demand, prices go up.

253. In a CNBC interview on March 7, 2018, Garlinghouse reminded investors that "[t]here's no party more interested in the success of the XRP ecosystem than Ripple . . . because we own a lot of XRP." Thus, he continued, Ripple had "invested in venture funds . . . in hedge funds . . . in companies, [and] . . . partnered with payment providers [and] . . . market makers, in order to make sure that XRP is the most useful asset out there for solving a cross border payment problem."

254. On April 11, 2018, Ripple tweeted from the handle @Ripple that it "had invested $25 million in XRP to Blockchain Capital Parallel IV, LP" to "support and develop additional [XRP] use cases beyond payments." Ripple Agent-3 similarly tweeted: "Ripple's $25 million investment in @blockchaincap's new fund is the first and not the last contribution to ventures that further develop the #blockchain and $XRP ecosystems."

255.    At various times, Ripple publicly touted that it was making certain of the XRP distributions through xPring or RippleWorks, further making clear to potential investors that Ripple was enlisting the efforts of persons other than investors with respect to XRP.

5.    *Economic Reality Dictates that XRP Purchasers Have No Choice But to Rely on Ripple's Efforts for the Success or Failure of Their Investment*

256.    Economic reality has also led reasonable investors to expect that Ripple and its agents will undertake significant efforts to increase the price of XRP.  Reasonable investors accordingly understanding that Ripple has the economic incentive and capacity to undertake efforts to promote XRP and the XRP Ledger, which would serve Ripple's economic interest and that of all XRP owners equally.

257.    Indeed, the XRP market capitalization as of last week (approximately $58 billion) and the value of Ripple's XRP holdings (approximately $28 billion) each far exceed the value of the one product—ODL—that "uses" XRP (which "use" is not market-driven, but subsidized by Ripple).

258.    The economic reality is that reasonable investors are speculating that Ripple has the incentive and potential to create demand for XRP.  XRP investors are betting that Ripple may yet solve Garlinghouse's "trillion-dollar problem," and they will profit as a result.

259.    In contrast to Ripple, investors in XRP cannot take most or any of the steps that Ripple has taken to grow the XRP ecosystem and increase demand for XRP.  Most, if not all, XRP investors simply lack the technical expertise and the resources to do so.

260.    XRP investors are not in any position to, for example, undertake various, complex, expensive, and all-encompassing strategies about when or how to sell XRP into the markets to protect XRP's price, volume, and liquidity—as Ripple has done in a purported attempt to foster adoption of XRP.  Nor are XRP investors in any position to increase significantly "demand" or "value" for XRP by developing a "use" for the token through entrepreneurial efforts—at least not

without Ripple's support. In other words, not only are Ripple's touted efforts with respect to XRP significant, they are essential to the success or failure of the enterprise.

261. Investors in XRP do not exercise any control or authority over how Offering proceeds have been or will be spent. Ripple possesses sole discretion to decide how to do so.

262. Because certain Ripple executives publicize that they hold XRP, and some (including Garlinghouse) state that they hold it as an investment, it is reasonable for a holder of XRP to expect these individuals to undertake efforts to increase the value and price of XRP.

263. Defendants' statements and actions and the economic reality of Ripple's relationship to XRP and of Ripple's payments to third parties to help it achieve widespread trading of XRP has led and will continue to lead reasonable investors to expect Ripple and its cadre of experts to undertake significant and essential technical, managerial, and entrepreneurial efforts on their behalf.

**B. Purchasers of XRP Invested into a Common Enterprise**

264. Investors who purchased XRP in the Offering invested into a common enterprise with other XRP purchasers, as well as with Ripple.

265. Because XRP is fungible, the fortunes of XRP purchasers were and are tied to one another, and each depend on the success of Ripple's XRP Strategy. In other words, Ripple's success or failure in propelling trading of XRP drives demand for XRP, which will dictate investors' profits (recognized in increased prices at which they could sell XRP) or losses.

266. XRP investors stand to profit equally if XRP's popularity and price increase, and no investor will be entitled to a higher proportion of price increases. In other words, the price of XRP rises and falls for XRP investors together and equally for all investors.

267. Moreover, Ripple pooled the funds it raised in the Offering and used them to fund its operations, including to finance building out potential "use" cases for XRP, paying others to assist it in developing a "use" case, constructing the digital platform it promoted, and compensating

executives recruited for these purposes. Ripple did not segregate or separately manage proceeds from different XRP purchasers in the Offering. The nature of XRP itself made it the common thread among Ripple, its management, and all other XRP holders.

268.   Defendants recognized and repeatedly emphasized these common interests to prospective investors, including by explaining to the market that Ripple used proceeds from XRP sales to fund its operations and that Ripple wanted XRP to succeed.

269.   For example, from the outset of Ripple's operations, Ripple Agent-1 and Cryptographer-1 made publicly clear that Ripple would sell XRP to raise funds for one common enterprise: to fund its operations, as described below.

270.   On March 10, 2013, Cryptographer-1 explained in the Ripple Forum on Ripple's website that Ripple's "source of revenue is the sale of XRP."

271.   A few months later, on August 28, 2013, Ripple Agent-1 echoed that sentiment, stating that Ripple "wholesales XRP to fund operations."

272.   On September 2, 2013, Ripple Agent-1 again noted on the Ripple Forum that Ripple "is funded by investments and the sale of XRP."

273.   Similarly, the next year, in its 2014 Promotional Document, Ripple explained its "plans to retain 25% of all XRP issued to fund operations (and hopefully turn a profit)."

274.   This public disclosure echoed Larsen's explanation, in an online interview dated April 14, 2014, that Ripple was "keeping 25% of . . . XRP . . . to cover the bills." When asked about Ripple's business model, Larsen reminded readers that Ripple was "keeping 25% of those XRP, and using the rest of it to incent market makers, gateways, consumers to come onto the protocol."

275.   From at least 2014 through at least 2017, Ripple made a similar representation in the Ripple Wiki: "Ripple Labs sells XRP to fund its operations and promote the network. This allows Ripple Labs to have a spectacularly skilled team to develope [sic] and promote the Ripple protocol."

276.    Ripple also made clear that the common interest was not just any interest, but a specific interest in XRP's price increasing, as Ripple's (significant) XRP holdings were essentially its only asset.  For example, in his Ripple Forum post from September 2013, Ripple Agent-1 stated that Ripple's "business model is to hold XRP in the hope that it will have value."

277.    At times, Ripple used the terms "value" and "price" interchangeably.  In one early promotional document distributed to Ripple investors and potential partners, Ripple asked whether digital assets could have "value" above a graph showing increases in the price of bitcoin, suggesting that XRP could have a similar increase.  And, on approximately December 12, 2017, Garlinghouse publicly responded to a question on Twitter about whether the "price of XRP" was "inconsequential or something you care about as a primary driver of business."  Garlinghouse said:  "[A] healthy $XRP market and healthy $XRP ecosystem is CRITICALLY important to me.  And it is indeed a primary driver.  Long-term price will reflect success driving institutional use of $XRP."

278.    In 2014, the Promotional Document explained Ripple's view that, "as demand for XRP grows, the value of XRP should appreciate" and that, therefore, "Ripple Labs believes that its incentives are aligned with those of protocol's users."

279.    Cryptographer-1 has repeatedly and publicly expressed that Ripple's incentives are aligned with other XRP holders'—specifically, as to increasing Ripple's price—because Ripple "holds a huge pile of XRP," including in a statement he made on XRP Chat on May 25, 2017.

280.    Garlinghouse in particular frequently encouraged investors to view their economic interests as aligned with Ripple's.

281.    As alleged above, on January 17, 2018, Garlinghouse tweeted an article discussing Ripple's remaining supply of XRP.  Garlinghouse's tweet noted that Ripple was not selling all of its remaining XRP supply, and that the article was "[a] good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

282.     The following month, in an interview on February 11, 2018, Garlinghouse acknowledged:  "Ripple the company, as the owner of 61% of the tokens today, is the most interested party in the success of the XRP ecosystem."

283.     Similarly, on March 7, 2018 in a CNBC interview, Garlinghouse stated:  "There's no party more interested in the success of the XRP ecosystem than Ripple.  We want that to be massively successful because we own a lot of XRP."

284.     Garlinghouse publicly reiterated sentiments similar to these on March 7, 2018 in an interview with the Financial Times and again on August 13, 2020 in an interview with a major financial publication, where he said:  "We are a capitalist, we own a lot of XRP.  So do I care about the overall XRP market?  100 per cent."

285.     On October 8, 2019 in a speech at the Economic Club of New York in Manhattan (the "Economic Club Speech"), Garlinghouse acknowledged:  "Ripple owns . . . about 55% of all XRP.  So clearly we're very interested in the health and success of that [XRP] ecosystem."  Asked about Ripple's "revenue model," he explained that while Ripple has software it sells, "it owns a lot of this digital asset" and that "[a]nything we do that is good for that digital asset is good for us."

286.     Currently, Ripple continues to make clear on its website that it holds at least 54 billion XRP, making it by far the largest single holder of the asset.

287.     The Legal Memos focused on this very fact—the existence of an identifiable actor who held itself out as responsible for making efforts with respect to XRP—in distinguishing XRP from bitcoin for purposes of the federal securities laws.  The Legal Memos noted that, unlike with bitcoin, there was "a specific entity," Ripple, "which is responsible for the distribution of [XRP] and the promotion and marketing functions of the Ripple Network."

288.     At least one Ripple equity shareholder ("Equity Investor A"), a sophisticated investor, understood this distinction.  In an internal email on April 26, 2018, an Equity Investor A

employee wondered whether the XRP Ledger was subject to a "51% attack" (a threat to the status

of the digital ledger), as he perceived the bitcoin blockchain to be.  He concluded that it was "more

of a longer-term question given the current incentives of the stake holders," meaning that Ripple

had incentives to protect the XRP Ledger.  Another employee agreed:  "That has always been the

point.  Ripple is controlled by 1 entity rather than through a distributed entity like Bitcoin."

    **C.**    **Ripple Led Investors to Reasonably Expect a Profit from Their Investment Derived from Defendants' Efforts**

289.    Ripple also led investors to reasonably expect that they could reap a profit from their

investment into XRP, derived from Ripple's and its agents' efforts into their common enterprise.

Ripple did so by, among other things, stating that Ripple's efforts sought to increase "demand" for

XRP; assuring investors that Ripple would take steps to protect the market for XRP, including by

fostering a readily available XRP trading market; highlighting XRP price increases and at times tying

them to Ripple's efforts; and selling XRP to certain institutional investors at discounted prices.

290.    Ripple made many of these statements in the Markets Reports, which typically

included a segment entitled "Market Commentary" for XRP, in which Ripple highlighted XRP price

increases and at times sought to persuade investors that Ripple's efforts lay behind such rallies.

    *1.*    *Defendants' Publicly Stated Goal Was to Increase "Demand" for XRP Through Their Entrepreneurial and Managerial Efforts*

291.    Throughout the Offering, as alleged in Section IV.A.1, above, Defendants repeatedly

told investors that Ripple's XRP-related efforts were meant to spur "demand" for XRP.  Ripple at

times even explicitly tied the hope for an increase in demand to what any reasonable investor would

understand an increase in demand to entail:  an increase in XRP's market price.

292.    Ripple made other such statements encouraging investors to expect to profit from

Ripple's efforts to create institutional demand for XRP.  For example, in response to questions

about XRP's declining market price during a March 14, 2018 interview, Garlinghouse explained that,

if Ripple was "successful in building out the project of xCurrent and expanding the number of users around xRapid, the price of XRP will take care of itself over a 3 to 5 year period."

### 2. *Ripple and Garlinghouse Assured Investors Ripple Would Protect the Trading Markets for XRP*

293. Ripple executives confirmed in internal emails that one of Ripple's goals in announcing the XRP Escrow was to encourage the price of XRP to go up. In a May 7, 2017 "XRP Markets Update" to certain Ripple executives, Ripple Agent-2 noted that "XRP activity in the last few days has been impressive, to say the least," and that this activity "seems to be driven by speculation around the lockup"; and highlighted the 50% "rall[y]" in XRP's price after Ripple Agent-2 publicly mentioned the possibility of the XRP Escrow for the first time.

294. Ripple sought to assure investors that they could trust Ripple to protect the XRP trading markets. Ripple repeatedly stated that it expected its XRP "distribution strategies" to strengthen its price vis-à-vis other assets and told investors it was establishing the XRP Escrow to remove uncertainty over the supply of XRP in the market (which Ripple viewed as depressing XRP's price). As Garlinghouse explained in a December 14, 2017 interview posted on Ripple's official YouTube channel ("Ripple's YouTube Channel"), Ripple established the XRP Escrow to "remove the perception that there's a risk" regarding XRP's supply, and "[t]he market reacted well to that."

### 3. *Ripple and Garlinghouse Touted Investors' Ability to Easily Buy and Sell XRP*

295. Related to Ripple's touting of its efforts to protect the trading markets for XRP, Ripple touted the ability of investors to buy and sell XRP on digital asset trading platforms (none of which had anything to do with "using" XRP in any way other than as a speculative vehicle).

296. Ripple undertook extensive efforts—starting in at least late 2015—to persuade digital asset trading companies to permit investors to buy and sell XRP on their platforms, especially those that would make XRP tradable against the USD, as alleged in Section III.B.

297.    On May 18, 2017, Ripple Agent-3 tweeted:  "Kraken [a digital asset trading platform] Introduces New Fiat Pairs for XRP Trading!  USD, JPY, CAD, EUR @Ripple."

298.    In the Markets Report for the first quarter of 2017 Ripple touted another platform's "successful launch of XRP for USD, EUR, and BTC currency pairs" as a "bright spot" for XRP.

299.    In a follow-up to his June 5, 2017 email described above, Garlinghouse demonstrated that he understood that announcements and actions regarding the increase in XRP trading liquidity could lead to price appreciation for XRP.  In response to a question by an individual about what was driving the "staggering appreciation" of prices in the digital asset space, Garlinghouse responded, among other things, that "for XRP more specifically," Ripple "announcements about new exchanges listing XRP . . . continues to create tailwinds," and that Ripple would continue making these efforts, "which should hopefully drive some tailwinds."

300.    On December 14, 2017, Garlinghouse stated on Ripple's YouTube Channel:  "Today XRP is listed at about fifty exchanges around the world.  Clearly we want XRP to be listed at more exchanges that are reputable and regulated in those appropriate markets.  So it is a very high priority for us to be listed more broadly but you know we're going to continue working on that with partners around the globe."

301.    Ripple itself publicly noted the importance of XRP being traded on digital asset trading platforms.  In articles published on its website on December 21, 2017 and January 18, 2018, Ripple noted:  "[I]t's a top priority for Ripple to have XRP listed on top digital asset exchanges. . . . Ripple has dedicated resources to the initiatives so you can expect ongoing progress."

302.    That day, Ripple also tweeted about "XRP Available on 50+ Exchanges."

    4.    *Ripple and Garlinghouse Touted XRP as an Investment, Including by Highlighting XRP Price Increases*

303.    Ripple and Garlinghouse also encouraged reasonable investors to view the purchase of XRP as something from which they could profit by persistently touting increases in XRP's price.

304.     In a January 18, 2017 email, Garlinghouse told an XRP investor that "XRP had a good year in 2016—with significant increases in price and volume—which in turn has increased investor interest."

305.     On March 24, 2017, Ripple tweeted:  "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."

306.     On May 3, 2017, Ripple tweeted:  "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last two months' via @Nasdaq."

307.     Two days later, on May 5, 2017, Cryptographer-1 tweeted, along with a picture of champagne, that he "finally got to drink the champagne [he was] reserving for #XRP at $0.10."

308.     On June 29, 2017, Ripple tweeted a clip of an interview Garlinghouse gave on CNBC with the caption:  "#XRP – up 4000% this year – has shown the market favors a real use case for #digitalassets."  Garlinghouse also predicted that "digital assets broadly are in a position to be more useful than gold as a value transfer" and described XRP as "solving a real-world use case."

309.     In the Markets Report for the third quarter of 2017, published October 19, 2017, Ripple touted the fact that anticipation surrounding Ripple's annual conference "had spurred a meaningful spike in XRP" and that this rise in price lacked any "corresponding rally in [bitcoin] and [the digital asset referred to as ETH]," noting that XRP's price was "at times overwhelmingly independent" from that of bitcoin and ETH.

310.     On December 7, 2017, when the XRP Escrow began, Ripple tweeted:  "55B $XRP is now in escrow.  Interested in what this means for $XRP markets?"  Garlinghouse similarly tweeted:  "Boom! 55B $XRP now in escrow.  Good for supply predictability and trusted, healthy $XRP markets.  Glad to finally let this #cryptokitty out of the bag!"

311.     A week later, on December 12, 2017, Garlinghouse retweeted Institutional Investor C's tweet:  "Wow, XRP at all time high!  Forget bitcoin, we're all in on XRP!"

312.     Later that month, on December 22, 2017, Garlinghouse tweeted an article discussing how "Ripple Soars at Year End," with the caption "I'll let the headline speak for itself.  $xrp."

313.     Ripple did not limit its touting of XRP purchases as a potential means for investors to profit only to increases in XRP prices in the abstract.  Frequently, Ripple explicitly tied actual or potential XRP investment returns to Ripple's completed or upcoming efforts—both with respect to developing demand for XRP and to protecting the XRP markets themselves.

314.     In connection with a significant rise in the price of XRP on March 23, 2017, Ripple explained in the Markets Report for the first quarter of 2017 that "key [Ripple] developments may have had an impact[,]" including statements by Ripple "about its commitment to XRP and the Ripple Consensus Ledger (RCL) as part of its long-term strategy."

315.     In the Markets Report for the second quarter of 2017, Ripple noted that various "XRP developments," including the XRP Escrow, were "instrumental in helping to drive XRP interest and volume," and highlighted Ripple's "clear plans . . . to address top concerns about XRP" in the following quarter.  Ripple also stated that "[t]here were a number of significant announcements and events which clearly contributed to XRP's incredible second quarter," reflected by a "stunning QoQ [price] increase of 1[,]159%" and "YTD [year to date] growth of 3[,]977%."

316.     Garlinghouse himself was a particularly persistent spokesperson for Ripple's efforts to market XRP as an investment from which investors could potentially profit.  While he was selling millions of XRP, Garlinghouse frequently told investors that he was invested in XRP, and that he was bullish on the investment.  Throughout the Offering and as XRP's price fluctuated, he also encouraged investors to be patient and look at the price of XRP on a longer time horizon.

317.     For example, in the June 5, 2017 email described above, Garlinghouse noted that Ripple's efforts to develop uses for XRP and the XRP Escrow had "translated into significant

improvements in both the liquidity (trading volume) and price of XRP," which was "up approximately 500 percent in the last 30 days and over 5,000 percent from the beginning of 2017!"

318.     In a follow-up to that email, an individual asked Garlinghouse to explain "what drives the staggering appreciation and/or volatility" in the "cryptocurrency markets." Garlinghouse responded with two reasons he described as "macro" reasons, then stated: "For XRP specifically, . . . as Ripple has done well in announcing customers – that has driven market interest in buying XRP as a speculative investment." He then gave examples of such Ripple announcements that were "catalysts to this market rally" or that "furthered the rally."

319.     Later, in a September 11, 2017 interview on CNBC, Garlinghouse noted Ripple's supposed success as a company and stated: "I think that's increased the value of XRP."

320.     The following month, during an October 18, 2017, question-and-answer session at a Ripple-sponsored conference, which was posted on Ripple's YouTube Channel, Garlinghouse repeated a statement he repeated frequently in similar terms: that he was "not focused on the price of XRP over 3 days, or 3 weeks, or 3 months" but, rather, "over 3 years and five years." He also stated, in response to a question about XRP's price, that he had "no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP, because we're solving a multi-trillion dollar problem."

321.     Similarly, in a November 2017 interview with CNBC, Garlinghouse noted: "On a personal basis, I'm long BTC, Bitcoin. I guess technically I'm long Bitcoin Cash. But I'm also long XRP." He repeated the sentiment the following month, in a December 14, 2017 interview with Bloomberg News. When asked if he invested in XRP, he said: "I'm long XRP, I'm very, very long XRP as a percentage of my personal . . . balance sheet" (though he had already sold at least 67 million XRP). Later, he reiterated, "I remain very, very, very long XRP, . . . I'm on the HODL side," referring to a digital asset industry term meaning to be long on an asset for long-term gains.

322.     In a March 12, 2018 interview with Bloomberg News, Garlinghouse, noting the potential market capitalization of XRP into the trillions of dollars, stated:  "[W]e have found that part of the reason why XRP has performed well, is because people realize. . . if we work with the system to solve this problem and we can solve that problem at scale, a problem measured in the trillions of dollars, then there is a lot of opportunity to create value in XRP."  Garlinghouse also speculated in the December 14, 2017 interview that, if a company created "utility" for a digital asset like XRP, "then there will be demand for the tokens, [and] the price of the tokens will go up."

323.     In the NYSE Interview, when the interviewer asked, "[s]o, XRP, is that a good investment?" and then insisted, "What's the investment case [for XRP]?", Garlinghouse responded that "the value of any digital asset in the long-term will be derived from the utility it delivers," presumably from Ripple's efforts, as the company had repeatedly emphasized to investors.

    *5.     Ripple's Privately-Stated Goal Was to Increase Speculation on the Price of XRP*

324.     As these public statements show, speculative investment in XRP was precisely what Ripple wanted and promoted—it needed speculative investment for its own stated strategy to be successful and to increase the value of and monetize its XRP holdings.

325.     Ripple explicitly stated these goals internally, including in documents describing one of the reasons to establish the XRP Escrow as securing speculative liquidity, with the hopes that it would lead to "immediate increase in volume and price appreciation."

326.     Ripple Agent-3's March 31, 2017 "Q2 [second quarter] XRP Plan Update" email to Garlinghouse acknowledged that Ripple was taking most of the steps described above to encourage speculative investment in XRP.  He also told Garlinghouse that "[t]he goal [was] to drive XRP speculative trading volume" and that the "tactics" Ripple planned to undertake to do so included "escrow announcement," "[s]ign[ing] exchanges," putting out information into the market to "tak[e] on skeptics," and announcing business deals to "[s]park speculation about potential partnerships."

6. *XRP's Characteristics—as Constructed by Ripple—Reasonably Fueled Purchasers' Expectations of Profiting*

327. The very nature of XRP in the market—as constructed and promoted by Ripple—compels reasonable XRP purchasers to view XRP as an investment.

328. Except for certain trading volume limitations, XRP is freely transferable or tradeable without restrictions the moment it is purchased, and it was offered broadly and widely to all potential purchasers, not just those who might be reasonably expected to "use" XRP.

329. Ripple made certain Institutional Sales of XRP at discounted priced, leading purchasers to reasonably expect to profit on their resale of XRP into the public markets.

330. Moreover, the value of Ripple's current holdings of XRP (approximately $28 billion as of last week) and of XRP's total market capitalization of approximately $58 billion—given that, as Garlinghouse has publicly stated, Ripple "would not be profitable or cash flow positive" without selling XRP—demonstrates that XRP investors are speculating that Ripple will achieve its stated goals with respect to XRP. In other words, market participants, when they buy XRP, are speculating that Ripple's economic incentives and its promises with respect to XRP will lead it to successfully solve the "trillion-dollar problem" that will increase demand for XRP.

331. As Garlinghouse summed it up in a December 29, 2017 interview with Bloomberg News, XRP's current market value and Ripple's holdings of XRP "gives [them] a huge strategic asset to go invest in and accelerate the vision we see for an internet of value. . . . For me this is all . . . about an opportunity to participate and accelerate a vision we've had for some time."

## V.   **In the Offering, Ripple Did Not Sell XRP for "Use" or as "Currency"**

### A.   **No Significant Non-Investment "Use" for XRP Exists, and Ripple Did Not Sell XRP in the Offering for "Use"**

332. The first potential use that Defendants touted for XRP—to serve as a "universal digital asset" and/or for banks to transfer money—never materialized.

333.     Not until approximately mid-2018 did Ripple first begin earnestly testing ODL—to date its only product that permits XRP use for any purpose.  The potential "users" of ODL that Ripple is targeting are money transmitters.

334.     ODL involves a transaction in which a money transmitter in a sender's jurisdiction converts fiat currency into XRP, transfers the XRP to a recipient's jurisdiction, and converts the XRP into the fiat currency of that locale.  Typically, instead of holding XRP directly, money transmitters who may use ODL would rely on market makers in the sender's and recipient's jurisdictions to trade in and out of XRP in about ninety seconds or less.

335.     ODL is an enterprise-grade software product intended for managing a financial institution's daily and long-term treasury operations—it is not intended for individual use.

336.     On June 21, 2018, Garlinghouse explained in a public speech that nobody was using XRP to effect cross-border transactions as of that date.  Instead, he said that Ripple "expect[ed] this year for at least one bank to use XRP in their payment flows, to use xRapid [ODL]."

337.     Ripple did not commercially launch ODL until October 2018.

338.     Since its launch, ODL has gained very little traction, in part due to certain costs of using the platform.  From October 2018 through July 26, 2020, only fifteen money transmitters (none of which are banks) signed on to potentially use ODL, and ODL transactions comprised no more than 1.6% of XRP's trading volume during any one quarter (and often substantially less).

339.     Much of the onboarding onto ODL was not organic or market-driven.  Rather, it was subsidized by Ripple.  Though Ripple touts ODL as a cheaper alternative to traditional payment rails, at least one money transmitter (the "Money Transmitter") found it to be much more expensive and therefore not a product it wished to use without significant compensation from Ripple.

340.     Between early 2019 and July 2020, the "Money Transmitter" conducted the overwhelming majority of XRP trading volume in connection with ODL.  Ripple had to pay the

Money Transmitter significant financial compensation—often paid in XRP—in exchange for the Money Transmitter's agreement to help Ripple increase volume on ODL.[4]

341.    Specifically, from 2019 through June 2020, Ripple paid the Money Transmitter 200 million XRP, which the Money Transmitter immediately monetized by selling XRP into the public market, typically on the very days it received XRP from Ripple.  The Money Transmitter publicly disclosed earning over $52 million in fees and incentives from Ripple through September 2020.

342.    The Money Transmitter became yet another conduit for Ripple's unregistered XRP sales into the market, with Ripple receiving the added benefit that it could tout its inorganic XRP "use" and trading volume for XRP.  The Money Transmitter has served that principal purpose for Ripple in exchange for significant financial compensation.

343.    Ripple and Garlinghouse did not disclose to XRP investors or the public the full extent of incentives that Ripple provided to the Money Transmitter in return for its assistance in increasing XRP trading volume.

344.    For example, in a September 12, 2019 interview on CNN, Garlinghouse refuted speculation that Ripple was manufacturing demand for ODL and claimed:  "When [the Money Transmitter] is moving money from U.S. dollar to Mexican peso, they're buying [XRP] at market.  There's no special sweetheart deal there."  While the Money Transmitter was buying XRP in the market at current market prices (not from Ripple), Garlinghouse did not disclose that Ripple was paying the Money Transmitter significant financial incentives to do so.

345.    Even after ODL's launch, Ripple publicly acknowledged in July 2019 that XRP has no significant use beyond investment, as alleged in paragraph 211 above.

---

[4]    In June and November 2019, Ripple also made equity investments in the Money Transmitter totaling $50 million in exchange for its stock and a seat on its Board of Directors.  Ripple currently holds approximately 9% of the Money Transmitter's publicly-traded stock.

346.     Though it had started selling XRP to public investors in 2013, Ripple announced, for the first time in its history in 2020, that it began selling XRP directly to money transmitters specifically for effecting money transfers through ODL.

347.     From May through mid-August 2020, Ripple sold XRP to two other money transmitters for use in ODL for total proceeds of approximately $70 million dollars.  In order to effectuate the ODL transaction, the money transmitters then immediately resold those XRP into the public markets, to individuals and entities that had no "use" for XRP.

348.     Ripple earns only *de minimis* fees from the ODL platform.  Instead, Garlinghouse views "the value creation of xRapid [ODL] as driving the liquidity in the XRP markets."

349.     Throughout the Offering, Defendants did not target sales of XRP to people to whom XRP's undeveloped, potential future "uses" could reasonably be expected to appeal.  For example, Defendants did not market XRP in the Offering to entities that might "use" XRP as a bridge currency or even to individuals who had a need for an alternative to fiat currency.

350.     Throughout the Offering, Defendants did not restrict sales of XRP to purchasers who would actually "use" XRP as a medium to execute cross-border transactions.  Defendants offered, sold, and distributed XRP to investors worldwide, in any quantities and at various prices.

351.     Throughout the Offering, Defendants offered, sold, and distributed XRP in amounts that far exceeded any potential "use" of XRP as a medium to transfer value.

352.     Defendants did not restrict the XRP they sold to money transmitters for use in ODL transactions.  Rather, a necessary final step in any ODL transaction includes selling the XRP into the market.

**B.     XRP Are Not "Currency" Under the Federal Securities Laws**

353.     In May 2015, Ripple and XRP II agreed (i) to settle charges brought by the United States Department of Justice and FinCEN for failing to register as a "Money Services Business"

under the Bank Secrecy Act and (ii) to comply with other regulatory requirements with respect to Ripple's XRP sales, which the settlement called "virtual currency."

354.    Consequently, Ripple has at times suggested that XRP are not securities, but instead exempt from the Securities Act altogether as "currencies."

355.    XRP is not "currency" under the federal securities laws.[5]

356.    XRP has not been designated as legal tender in any jurisdiction.  XRP is not issued by, nor is backed by the full faith and credit of, any country, national government, central bank, or other central monetary authority.  A "native currency" that operates, for example, on Ripple's decentralized network of blockchain technology is a specialized instrument for a particular computer network, not legal tender.  Similarly, using XRP as a "bridge" between two real, fiat currencies does not bestow legal tender status on XRP.

357.    Moreover, Ripple has never offered or sold XRP as "currency," as that term is used in the federal securities laws.  Throughout the Offering, Ripple never restricted offers or sales of XRP solely to purchasers who had a need for alternatives to traditional, fiat currencies, nor did Ripple promote XRP as an instrument for consumers to purchase goods or services.

358.    Instead, Ripple and its executives repeatedly publicly disclaimed that XRP was "currency" and tried to dissuade investors from thinking about XRP as "currency."

359.    For example, in June 2016, Cryptographer-1 explained in a public XRP Chat post: "We do not plan to encourage use of XRP as an alternative to Bitcoin or as a direct payment method at this time."

---

[5]    FinCEN has repeatedly reiterated its view that "virtual currency" that may be converted for traditional fiat currencies may still be subject to the federal securities laws "regardless of other intended purposes" for the convertible virtual currency.  *See, e.g.*, FinCEN Guidance, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies, FIN-2019-G001 (May 9, 2019) *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.

360.    Two years later, in a press conference on March 14, 2018, Garlinghouse stated:

> I almost never use the expression cryptocurrency.  And the reason is today, these aren't currencies.  I can't go down to Starbucks and buy a coffee with Bitcoin.  I can't buy . . . coffee with XRP. . . . Currencies, traditionally, are something you can use to transact efficiently and broadly.  Very few people, even in the crypto community have used the, you know, Bitcoin or XRP to buy something.

361.    Similarly, in Garlinghouse's Economic Club Speech in October 2019, a moderator asked Garlinghouse for an example of using XRP "to buy or sell something."  Garlinghouse responded:  "XRP in my judgment, and really any crypto, I don't think the use case is a consumer use case today. . . .  [W]hen people talk about using crypto for consumer use case I go to the 'well what problem are we trying to solve?' . . .  [I]n first world countries like the United States . . . I don't see the consumer use for crypto any time soon," or even for "95% of global GDP."

362.    Ripple's own current internal policies treat XRP as securities—not currency.

363.    Since at least 2015, Ripple's internal "Code of Conduct" has directed Ripple "[i]nsiders" not to "buy, sell, recommend or trade XRP" in possession of "information about Ripple or the Ripple protocol that has not been publicly announced, and which might reasonably affect the decision to buy or sell XRP"—effectively, a prohibition against insider trading, applicable to securities under the federal securities laws.

364.    Similarly, since at least July 2019, Ripple has banned certain members of its "leadership team" from entering into a "trading plan" for XRP "on the basis of information a reasonable person would consider important in making his or her decision to purchase, hold or sell XRP"—another implicit reference to rules governing insider trading.

365.    Even if some country were to recognize XRP as fiat "currency" at some point in the future, that would result from Defendants' significant entrepreneurial and managerial efforts to date (and likely in the future), on which public investors expecting profit relied when making an investment of money into Defendants' common enterprise.

## VI. Defendants Failed to Register the Offering with the SEC

366. Defendants used interstate commerce for the Offering by, among other things, promoting investments in XRP in emails, interviews disseminated to the public through television and the Internet, and publicly available social media applications; and by effecting transfers of XRP and of the Offering proceeds through global digital asset trading platforms.

367. Defendants have never filed a registration statement with the SEC with respect to any XRP they have offered or sold or intend to offer or sell, and no registration statement has ever been in effect with respect to any offers or sales of XRP.

368. Ripple's public disclosures contained selective or no information about Ripple's financial history, audited financial statements, management discussion and analysis of its financial condition and results of operations, and ability to generate profits, and no information about Ripple's ability to develop XRP into a substitute for certain financial transactions. Purchasers who bought or received XRP have not received any documents containing information about Ripple's operations, financial condition, or other factors relevant in considering whether to invest in XRP. XRP investors have also been deprived of information about how Ripple's executives are being compensated as a result of the Offering or about Ripple's use of funds derived from the sale of XRP. Nor have investors received complete information about any steps Ripple is taking to incentivize financial institutions to adopt XRP for use in a payment system, including the extent and nature of incentive payments made to businesses Ripple touts as market-driven "users" of its products, and about steps that Ripple takes in attempts to affect the trading price of XRP. In short, XRP purchasers and the market lack information that issuers provide under the Securities Act and the Exchange Act when they solicit public investment and foster a secondary market when their securities are publicly traded.

## VII. Larsen and Garlinghouse Knowingly or Recklessly Provided Substantial Assistance to Ripple's Unregistered Offering

### A. Larsen Assumed the Risk that XRP Could Be a Security and Pushed the Offering Forward

369.    Ripple and Larsen knew that XRP may be a security from the onset of the Offering and simply ignored legal requirements regarding registration and required periodic and current public disclosures.  As described above in Section I.B, above, the Legal Memos Ripple commissioned in February and October 2012 warned that there was some risk that XRP would be considered an "investment contract" (and thus a security under the federal securities laws) depending on various factors.

370.    Although both the February 2012 and the October 2012 Legal Memos warned that, if an XRP purchaser was induced to buy XRP as a speculative investment, this would increase the risk that XRP could be considered part of an investment contract, Larsen did not restrict his or Ripple's sales of XRP to "users" of XRP.  To the contrary, under both Larsen's and Garlinghouse's stewardship, Ripple promoted XRP as a speculative investment when either no use case existed or, with the eventual development of the ODL product, only a small fraction of XRP arguably was being "used" for a few moments for non-investment purposes before being sold to investors.

371.    Larsen understood that investors were purchasing XRP as an investment—precisely the situation that both the February 2012 and the October 2012 Legal Memos had warned could lead to a determination that XRP was a security.

372.    For example, on February 6, 2017, "an early investor in XRP" wrote Larsen to "understand [his] view on XRP."  Larsen responded that Ripple's "strategy of focusing on connecting banks serves . . . emerging trends" such that "the more banks that connect thru Ripple . . . the more demand we should see for XRP as an asset to reduce liquidity costs."  Acknowledging the investors' "concerns around the current state of volume flows" for XRP, Larsen concluded:

"Frankly, the entire industry is really in the earliest stages of developments. Most volume in the space is speculation in advance of enterprise and eventually consumer flows."

373. Larsen also received additional warnings that XRP could be subject to the federal securities laws. On January 5, 2015, the head of an entity establishing a fund to invest in XRP forwarded to Larsen an email from the fund's attorney, who worked at a prominent global law firm. The attorney's email advised that, while the attorney did not know "whether a virtual currency is itself a security[,] . . . one certainly can create a security by packaging virtual currency."

374. Including as described above in this Complaint, Larsen provided substantial assistance to Ripple's unregistered Offering by making promotional statements, engaging in his own sales, speaking to investors in XRP to assuage their concerns about buying XRP, negotiating certain XRP sales, and approving decisions to sell XRP into the market when he was Ripple's CEO. Larsen acted at least recklessly while engaging in this conduct.

## B. Garlinghouse Was Warned and Understood That XRP Had "Securities-Type" Characteristics

375. By at least June 2017, Garlinghouse knew or recklessly disregarded that Ripple's offers and sales of XRP were part of the offer and sale of an investment contract and thus a security.

376. For example, in an email conversation between Garlinghouse and Ripple Agent-1 on June 2015, Ripple Agent-1 expressed a desire to maintain a Ripple trading platform to specifically and uniquely target "non-consumer[s]." In response, Garlinghouse told Ripple Agent-1 it was "not clear to [him] . . . how one would reasonably discern (through an online process) between a speculator and a consumer." In essence, Garlinghouse conveyed that Ripple was then already unable to distinguish between sales it made to speculators and to "consumers."

377. On March 11, 2017, Ripple's then-chief compliance officer explained to Garlinghouse in an email that "XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging."

378. On April 16, 2017, Garlinghouse was similarly advised by e-mail that the same chief compliance officer "want[ed] to make sure the verbiage [in employee offer letters regarding XRP notional value] doesn't put us at risk of XRP sounding like a security."

379. Garlinghouse, demonstrating a keen interest in the regulatory status of digital assets, also commented on Ripple's website immediately after the SEC issued the *DAO Report* in July 2017: "I say, if it looks like a duck and quacks like a duck then let's regulate it like a duck."

380. Garlinghouse nevertheless continued to make XRP sound like a security, including in interviews later in 2017 boasting about being "very long" XRP and in comments in connection with the XRP Escrow about how Ripple's efforts were meant to stabilize XRP's price.

381. The following year, in January 2018, Garlinghouse again demonstrated he understood at least certain factors that could determine whether XRP could be deemed a security. Only weeks after he touted being "very long" XRP in interviews, he commented, on an internal Ripple draft document, that XRP should not be promoted as an investment.

382. The following month, in a Yahoo! Finance interview he gave in February 2018, Garlinghouse acknowledged his understanding that "if there is not a real use case then it's really a securities offering. And if it's a securities offering there's not regulatory uncertainty. It should be regulated as a securities offering." At that time, Garlinghouse knew or recklessly disregarded that none of Ripple's sales of XRP up to that point had been with respect to any "use" of XRP.

383. Garlinghouse also admitted in a non-public setting that he is cognizant of the risk that XRP could be "classified as a security." Specifically, as reflected in an Equity Investor A employee email, dated July 23, 2018, Garlinghouse (accompanied by Larsen) met with Equity Investor A, "spoke for a while on the outstanding issue of whether XRP gets classified as a security," and noted that, while he was "optimistic that" it would not, he could "[]not guarantee that."

384. In a speech he gave in Manhattan in October 2019, Garlinghouse further acknowledged that people are "speculating on digital assets" and that "99.9% of all crypto trading today is just speculation," a factor he knew could lead to a determination that XRP was a security.

385. Throughout the course of this conduct, Garlinghouse had an incentive to make efforts to increase XRP's trading price and volume. Pursuant to an options grant of up to 500 million XRP dated December 13, 2016, Ripple would pay Garlinghouse in XRP, only if the volume weighted average price of XRP was "at least $0.02/XRP" for four consecutive weeks and the weekly XRP trading volume was at least 1.4 billion for at least four consecutive weeks.

386. Garlinghouse understands that Ripple is not profitable and cannot operate without continued sales of XRP, as he has publicly stated.

387. From April 2015 to the present, Garlinghouse provided substantial assistance to Ripple in conducting its Offering.

388. In addition to making the various promotional statements and efforts described above in this Complaint, Garlinghouse, as both COO and later CEO, participated in weekly XRP sales meetings where he exercised final decision-making authority over the timing and amount of Ripple's XRP sales, including whether to adjust Ripple's XRP sales based on factors such as market conditions, volume, price, or the capital needs of the company.

389. Garlinghouse similarly exercised final decision-making authority over how much XRP Ripple would offer and sell on a daily basis.

390. Garlinghouse also made the decision to establish the XRP Escrow and approved paying XRP as incentives to digital asset trading platforms for "listing" XRP or achieving certain trading volume benchmarks.

391. Garlinghouse acted at least recklessly while engaging in this conduct.

## TOLLING AGREEMENTS

392.     Ripple and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from April 1, 2019 through June 30, 2019, from July 7, 2019 through September 7, 2019, from September 8, 2019 through December 8, 2019, from December 9, 2019 through June 8, 2020, from June 9, 2020 through December 9, 2020, and from December 10, 2020 through December 24, 2020.

393.     Larsen and the SEC entered into a tolling agreement suspending the running of any applicable statute of limitations from September 1, 2020, through December 31, 2020.

## FIRST CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (All Defendants)

394.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 393.

395.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, and (b) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

396.     Ripple violated Sections 5(a) and 5(c) of the Securities Act by conducting the Offering.  Ripple violated these provisions by, among other things, from 2013 through the present, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell 14.6 billion XRP without a registration statement in effect as to XRP, and by making use of the means and instruments of

transportation or communication in interstate commerce or of the mails to offer to sell XRP, which were offered and sold as securities, as to which no registration statement had been filed.

397.     Larsen violated Sections 5(a) and 5(c) of the Securities Act by, from 2013 through the present, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell 1.7 billion XRP without a registration statement in effect as to XRP, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell XRP, which were offered and sold as securities, as to which no registration statement had been filed.

398.     Garlinghouse violated Sections 5(a) and 5(c) of the Securities Act by, from 2016 through the present, directly and indirectly making use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell 321 million XRP without a registration statement in effect as to XRP, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell XRP, which were offered and sold as securities, as to which no registration statement had been filed.

399.     By reason of the conduct described above, Defendants, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 5(a) and 5(c)
### (Larsen and Garlinghouse)

400.     The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 393.

401.     By engaging in the acts and conduct described in this Complaint, Defendants Larsen and Garlinghouse, directly or indirectly, knowingly or recklessly provided substantial assistance to

Ripple, who, from 2013 through the present, directly and indirectly have made and are making use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell 14.6 billion XRP without a registration statement in effect as to XRP, and by making use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell XRP, which were offered and sold as securities, as to which no registration statement had been filed.

402.  Larsen knowingly or recklessly provided substantial assistance to Ripple's violations of Sections 5(a) and 5(c) of the Securities Act including by: (i) from 2013 to 2016, deciding when and how much XRP Ripple would sell, establishing the XRP Escrow, making promotional statements with respect to XRP, and spearheading Ripple's efforts to attempt to increase demand for XRP; and (ii) from 2015 to the present, making his own sales of XRP.

403.  Garlinghouse knowingly or recklessly provided substantial assistance to Ripple's violations of Sections 5(a) and 5(c) of the Securities Act, including by, from 2015 to the present, deciding when and how much XRP Ripple would sell, establishing the XRP Escrow, making promotional statements with respect to XRP, spearheading Ripple's efforts to attempt to increase demand for XRP, and making his own sales of XRP.

404.  By reason of the foregoing, Larsen and Garlinghouse are liable pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] for aiding and abetting Ripple's violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)] and, unless enjoined, will again aid and abet violations of these provisions.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], including by delivering XRP to any persons or taking any other steps to effect any unregistered offer or sale of XRP;

**II.**

Ordering Defendants to disgorge all ill-gotten gains obtained within the statute of limitations, with prejudgment interest thereon, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

**III.**

Prohibiting Defendants from participating in any offering of digital asset securities pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

**IV.**

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

**V.**

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
      December 22, 2020

*Richard R. Best*
Richard R. Best
Preethi Krishnamurthy
Jorge G. Tenreiro
Dugan Bliss
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

Of Counsel
Kristina Littman
John O. Enright
Daphna A. Waxman
Jon Daniels